## BOYD *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
WESTERN DISTRICT OF ARKANSAS.

No. 1048.   Argued December 16, 1891. — Decided January 4, 1892.

The full and unconditional pardon of a person convicted of larceny and sentenced to imprisonment therefor completely restores his competency as a witness, although it may be stated in the pardon that it was given for that purpose.

On the trial of a person indicted for murder, it appeared in evidence that the killing followed an attempt to rob. The court admitted, under objections, evidence tending to show that the prisoner had committed other robberies in that neighborhood, on different days, shortly before the time when the killing took place, and exceptions were taken. *Held,* that the evidence was inadmissible for any purpose.

THE case is stated in the opinion.

*Mr. H. J. May* for plaintiffs in error.   *Mr. A. H. Garland* filed a brief for same.

*Mr. Assistant Attorney General Maury* for defendants in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

The plaintiffs in error were jointly indicted in the court below for the crime of murder, alleged to have been committed on the 6th day of April, 1890, at the Choctaw Nation, in the Indian country, within the Western District of Arkansas; the first count alleging that the person murdered, John Dansby, was a negro, and not an Indian; the second, that the defendants were white men, and not Indians.  The court, in its charge

to the jury, said that the second count differed from the first "by alleging that Eugene Standley, alias Eugene Stanton (he is charged in that way in both counts) and John Boyd were white men and not Indians. The proof, without any controversy, shows that Standley is an Indian; therefore you will confine your finding, if it should be a verdict of guilty, to the first count in the indictment, if the proof shows that fact with reference to Standley and you should find him guilty. If it shows such other facts as are necessary to give the court jurisdiction, as are alleged in the first count of the indictment, then your finding will be on that count, provided you should find a verdict of guilty. If you should find a verdict of not guilty it may be general in its character, and it would be responsive to both charges."

The defendants were found guilty of murder as charged in the first count. A motion for a new trial having been overruled, the defendants were condemned to suffer the punishment of death.

The proof was conflicting upon many points, but there was evidence tending to show the following facts: In the night of April 6, 1890, the defendants, Boyd and Standley, with John Davis *alias* Myers, came to a ferry, on Cache Creek, in the Indian country, a short distance from Martin Byrd's at whose house, at the time, were John Dansby, the deceased, Joseph Byrd, a brother of Martin Byrd, and Richard Butler. The defendants and Davis, or one of them, called to the ferryman, Martin Byrd, to come and set them over the creek. Byrd protested that he did not like to do work of that kind after dark, but finally consented to get the key of the boat, and take them across the creek. He went to his house, avowedly to obtain the key; and, after remaining away some time, returned, accompanied by Dansby, Joseph Byrd and Richard Butler, each with weapons. When Martin Byrd reached the ferry boat, and was about to unlock the chain by which it was held fast — Boyd being at the time in the rear end of the boat, while Davis and Standley were sitting upon the bank of the creek — Davis said to him, "Lay down that chain, and throw out your rusty change." Upon Byrd saying, "Don't you want

to cross?" Davis, holding his pistol upon Byrd, replied, with an oath, "No, it's your money we're after." Dansby started towards Byrd, and was shot in the back by Boyd. When Davis presented his pistol at Martin Byrd, the latter, dropping upon his knees, drew a pistol. The ball from Davis' pistol passed over Byrd's head, but Davis was shot by Byrd, and died instantly. The firing immediately became general. Butler shot Boyd in the back, Standley shot at Joseph Byrd, but was himself slightly wounded by a shot from the latter's pistol. Boyd, although badly wounded, went up the creek some little distance, but, being followed, was secured and carried to Martin Byrd's house, as a prisoner. He remained there until he was arrested by an officer upon the charge of having murdered Dansby. Standley escaped, and it was some time before he was arrested. Dansby lived a few days only, and died at Martin Byrd's house, from the wounds inflicted upon him on the above occasion.

Upon the part of the defendants there was evidence tending to show a case, in some respects, materially different. They contended — to use the words of their counsel — "that while Boyd was sitting in the boat and Standley and Davis on the bank, the ferryman and his party came around with Winchester rifles and revolvers, and before they suspected anything had levelled their guns on him and Davis, and told them to give up their pistols; that they had the description of some men that had robbed Judge Taylor; that he handed up his pistol, which they took, and Davis drew his out, but whether to comply or to resist he does not know; that they fired on Davis and killed him; that he turned, and, as he did so, was shot in the shoulder and fell, the ball remaining under the point of the shoulder blade; that they ran after Boyd, and while they were gone he picked up Davis' pistol and ran off and hid."

The principal witness for the prosecution, at the trial, was Martin Byrd. When presented as a witness, the defendants objected to him as incompetent, by reason of the fact that he had been convicted of the crime of larceny and sentenced to the penitentiary, the record of such conviction being offered

in support of the objection. The government thereupon produced a pardon from the President of the United States, as follows:

" Benjamin Harrison, President of the United States of America, to all to whom these presents may come, greeting :

" Whereas, Martin Byrd, in the United States District Court for the Western District of Arkansas, was indicted, charged with larceny, convicted May 10th, 1884, and on the 19th day of May, 1884, was sentenced to one year's imprisonment in the Detroit House of Correction, Detroit, Michigan ; and whereas the said Martin Byrd has been discharged from said prison, he having served out the term for which sentenced, and was accredited for good behavior while in prison ; and whereas the district attorney for the Western District of Arkansas requests the pardon of said Martin Byrd, in order to restore him to competency as a witness in a murder trial to be had July 1st, next, in said District Court at Little Rock, in which request the judge of said District Court unites : Now, therefore, be it known that I, Benjamin Harrison, President of the United States of America, in consideration of the premises, divers other good and sufficient reasons me thereunto moving, do hereby grant to the said Martin Byrd a full and unconditional pardon.

" In testimony whereof I have hereunto signed my name and caused the seal of the United States to be affixed.

" Done at the city of Washington, this 27th day of June, A.D. 1890, and of the Independence of the United States the one hundred and fourteenth.

" (The place of the seal.)        BENJAMIN HARRISON.

" By the President: JAMES G. BLAINE, *Sec. of State.*"

This pardon removed all objections to the competency of Martin Byrd as a witness. The recital in it that the district attorney requested the pardon in order to restore Byrd's competency as a witness in a murder trial to be had in the District Court at Little Rock, did not alter the fact that the pardon was, by its terms, " full and unconditional." The dis-

ability to testify being a consequence, according to the principles of the common law, of the judgment of conviction, the pardon obliterated that effect. The competency as a witness of the person so pardoned was, therefore, completely restored. *United States* v. *Wilson*, 7 Pet. 150; *Ex parte Wells*, 18 How. 307, 315; *Ex parte Garland*, 4 Wall. 333, 380; 4 Bl. Com. 402.

The principal assignments of error relate to the admission, against the objection of the defendants, of evidence as to several robberies committed prior to the day when Dansby was shot, and which, or some of which at least, had no necessary connection with, and did not, in the slightest degree, elucidate the issue before the jury, namely, whether the defendants murdered John Dansby on the occasion of the conflict at the ferry. This evidence tended to show, and, for the purposes of the present discussion, it may be admitted that it did show, that, in the night of March 15, 1890, Standley, under the name of Henry Eckles, robbed Richard C. Brinson and Samuel R. Mode; that in the afternoon of March 17, 1890, he and Boyd robbed Robert Hall; that in the night of March 20, 1890, Standley, under the name of John Haynes, together with Davis, robbed John Taylor; and that, in the evening of April 5, 1890, Davis, Boyd and Standley robbed Rigsby's store. In relation to these matters, the witnesses went into details as fully as if the defendants had been upon trial for the robberies they were, respectively, charged by the evidence with having committed. The admissibility of this evidence was attempted to be sustained, in part, upon the ground that Martin Byrd and his crowd, having the right to arrest the parties guilty of the robberies, were entitled to show that the robberies had been, in fact, committed by the defendants. While the evidence tended to show that Martin Byrd had information, prior to April 6, 1890, of the Taylor robbery, and of Taylor having offered a reward for the arrest and conviction of the guilty parties, there is nothing to show that he or his associates had ever heard, before the meeting at the ferry, of the robberies of Brinson, Mode, Hall and Rigsby. It is said that the evidence in chief as to what occurred at the

time of the shooting, left the identity of the defendants, or at least of Standley, in some doubt, and that the facts, connected with the robbery of Rigsby, showing that the defendants and Davis were all engaged in it, and were together only the night before Dansby was shot, tended not only to identify Standley and Boyd, but to show that they came to the ferry for the same purpose with which they went to Rigsby's house, namely, to rob and plunder for their joint benefit; and, consequently, that each defendant was responsible for Dansby's death if it resulted from the prosecution of their felonious purpose to rob.

. The rule upon this subject was thus expressed by the court in its charge to the jury: "If a number of men agree to do an act which, from its nature or the way it is to be done, is an act that will put human life in jeopardy, then the putting of human life in jeopardy, or the destruction of human life, is a necessary and a natural and a probable consequence of the act agreed to be done by the party, and upon the principle of the law I have already announced to you, it is but equal and exact justice that all who enter upon an enterprise of that kind should be responsible for the death of an innocent person that transpires because of the execution of the enterprise then entered upon, and because that enterprise is one that would naturally and reasonably produce that result." Again: "Now the law defines the character of crimes that, if a number of persons enter upon the commission of them they may be affected by a result of this kind. It says robbery is one of them. Why? Robbery has the very element that enters into it, to distinguish it, to make it a crime, as that of violence upon the person, and it is but a probable and natural and reasonable consequence of an attempt to commit that crime that a human life will be destroyed. The very demand of a man who robs — 'Your money or your life!' — implies that human life is in jeopardy; so that when a number of persons agree to and enter upon the commission of the crime of robbery, and a person is killed, who is an innocent person, in the execution of that purpose to rob, all the parties who have so entered into the agreement and enter

upon the execution of the purpose to rob are equally responsible. The pistol or gun fired is the pistol or gun of each and every one of them. There are other crimes of a like character, and the law, I say, draws this distinction, and bases it upon a just ground. It says that any crime which, from its nature and the way it is usually committed, will necessarily or probably or reasonably endanger a human life, is a crime that, if a number of persons agree to commit, and enter upon the commission of, will involve them all in the consequences that ensue. The commission of robbery is a crime that may cause the death of an innocent person."

These principles, of the soundness of which we entertain no doubt, were enforced by the court in its charge by numerous illustrations drawn from adjudged cases and text-writers of high authority. This being done, it proceeded: "Now it becomes necessary for the court to remind you of what figure these other crimes that have been proven cut in the case. This crime of the robbery of Rigsby may be taken into consideration by you in passing upon the question of the identity of the defendants. It is a competent fact for that purpose. You will remember that the evidence shows that goods were found upon the person of one of these parties who was present at this ferry when the killing of Dansby took place, that were sworn to by Rigsby as having been taken by the three parties, the man Davis or Myers and these two defendants, from his store. That would be evidence that might be taken into consideration with the statements of these colored witnesses who were present at the time, and undertook to point out and identify these defendants; that may be taken into consideration for that purpose. If you believe in the theory that there was an attempt made to arrest upon the part of these parties, and that the attempt wasn't made by these defendants, together with Davis, to commit a robbery upon them, then the fact that the robbery of Rigsby had transpired, and the robbery of Taylor and these other robberies that have been proven before, may be taken into consideration to show that crime had been committed, that would give the citizen the right to make an arrest provided there was reasonable ground to believe, in your

judgment, at the time, that the parties they were seeking to arrest were the ones that had committed those crimes. They may be taken into consideration for that purpose. You are not to consider these other crimes as make-weight against the defendants alone. That is to say, you are not to convict the defendants because of the commission of these other crimes. They were admitted for the specific purposes that I have named. They are not to influence your minds so as to induce you to more readily convict them than you would convict them if the crimes had not been proven against him. That is the figure they cut. That is the reason they were admitted as testimony before you."

The charge made no reference to the robberies committed upon Brinson, Mode and Hall, except as they may have been in the mind of the court, when it referred to "these other crimes." Whatever effect, prejudicial to the defendants, the proof of the robberies upon Brinson, Mode and Hall produced upon the minds of jurors, remained with them, except as it may have been modified by the general statement that the defendants were not to be convicted "because of the commission of these other crimes." The only other crimes referred to in the charge (other than the alleged murder of Dansby) were the Rigsby and Taylor robberies. The jurors were particularly informed as to the purposes for which the court admitted testimony in respect to those two robberies; but they were left uninstructed, in direct terms, as to the use to which the proof of the Brinson, Mode and Hall robberies could be put in passing upon the guilt or innocence of the particular crime for which the defendants were indicted. It is true, as suggested by counsel for the government, that no exception was taken to the charge. But objection was made by the defendants to the evidence as to the Brinson, Mode and Hall robberies, and exception was duly taken to the action of the court in admitting it. That exception was not waived by a failure to except to the charge.

If the evidence as to crimes committed by the defendants, other than the murder of Dansby, had been limited to the robberies of Rigsby and Taylor, it may be, in view of the

peculiar circumstances disclosed by the record, and the specific directions by the court as to the purpose for which the proof of those two robberies might be considered, that the judgment would not be disturbed, although that proof, in the multiplied details of the facts connected with the Rigsby and Taylor robberies, went beyond the objects for which it was allowed by the court. But we are constrained to hold that the evidence as to the Brinson, Mode and Hall robberies was inadmissible for the identification of the defendants, or for any other purpose whatever, and that the injury done the defendants, in that regard, was not cured by anything contained in the charge. Whether Standley robbed Brinson and Mode, and whether he and Boyd robbed Hall, were matters wholly apart from the inquiry as to the murder of Dansby. They were collateral to the issue to be tried. No notice was given by the indictment of the purpose of the government to introduce proof of them. They afforded no legal presumption or inference as to the particular crime charged. Those robberies may have been committed by the defendants in March, and yet they may have been innocent of the murder of Dansby in April. Proof of them only tended to prejudice the defendants with the jurors, to draw their minds away from the real issue, and to produce the impression that they were wretches whose lives were of no value to the community, and who were not entitled to the full benefit of the rules prescribed by law for the trial of human beings charged with crime involving the punishment of death. Upon a careful scrutiny of the record we are constrained to hold that, in at least the particulars to which we have adverted, those rules were not observed at the trial below. However depraved in character, and however full of crime their past lives may have been, the defendants were entitled to be tried upon competent evidence, and only for the offence charged.

*The judgment is reversed, and the cause remanded, with directions to grant a new trial.*