## BUTLER v. UNITED STATES.
### No. 482.

Circuit Court of Appeals, Tenth Circuit.
Nov. 18, 1931.

C. V. Caldwell, of Los Angeles, Cal. (Minor Moore, of Los Angeles, Cal., on the brief), for appellant.

George H. Lunt, Asst. U. S. Atty., of Salt Lake City, Utah (C. R. Hollingsworth, U. S. Atty., and E. C. Jensen, Asst. U. S. Atty., both of Salt Lake City, Utah, on the brief), for the United States.

Before PHILLIPS and McDERMOTT, Circuit Judges, and POLLOCK, District Judge.

McDERMOTT, Circuit Judge.

Four indictments were returned against the appellant, all of them charging the use of the mails in the execution of a scheme to defraud. The different indictments relate to different loans that were discounted; the different counts set out various letters concerning the loan made the basis of the particular indictment. All of the charges grow out of the activities of the appellant as president and general manager of the Western Livestock Loan Company, of Salt Lake City, for the months immediately preceding March 14, 1928, when the company went into a receivership. The cases were tried as one, and concurrent sentences imposed. It will be unnecessary, in this opinion, to deal with the cases separately.

The proof developed, without substantial contradiction, that since 1917 the Western Livestock Loan Company (hereafter referred to as the company) had been engaged in the business of lending money on live stock security, and selling the loans to banks in various parts of the country, either directly or through note brokers, the company guaranteeing the payment of the loans. Each year the company would establish a line of credit with such banks or brokers, and would furnish them with a statement of the financial condition of the company. When a cattleman or sheepman applied for a loan, the company would send out an inspector to examine the cattle or sheep offered as security; the inspector would make a written report; the company would take a financial statement of the borrower; if the loan was approved, the borrower would execute a note and chattel mortgage, generally for a short term. The company, if in funds, would pay out on the loan to the borrower, and then sell the paper; if not in funds, it would sell the paper and then pay the borrower. In either event, the loan would be offered to a bank, the note and mortgage being accompanied by the financial statement of the borrower and by the inspector's report. It takes but a limited knowledge of banking to know that when these loans were offered for sale, that the company represented that (a) the paper offered evidenced bona fide loans to honest-to-goodness borrowers; (b) the security offered was a first lien; (c) the financial statement of the borrower had been made by him, and that the company was not aware of its falsity or forgery; (d) the inspector's report was genuine; and (e) the financial statement of the company, which guaranteed the loan, was true and correct when made. These representations are necessarily implied from the nature of the transaction, just as one represents a check to be genuine when he offers it to a bank for cashing. The representations are material; in buying paper, banks rely upon the financial statement of the maker and guarantor;

upon the value of the security offered and the priority of the lien; and upon the moral risk—the probability that an honest man will endeavor to pay the debts he has honestly contracted.

Through many years of honest dealing, the company had built up an enviable reputation; both borrowers and banks believed in it and trusted it. Through the same years, the dangerous practice grew up of borrowers signing instruments in blank. If a borrower wanted $20,000 he would execute a single set of papers for that amount; often it developed that such a loan could not be marketed except through brokers, who would sell it in pieces of $2,000 each. It was inconvenient to recall the cattleman from his range; so he would sign ten additional sets of papers in blank, so that the loan could be broken up in smaller denominations if need be. During the term of the paper, cattle might be sold, and the proceeds held to apply on the note; partial renewals of the notes originally made often were contemplated, the amounts of which could not be determined when the original papers were made. To avoid the long trek from his outfit to town when the note matured, the borrower would sign blank papers to be used when and if a renewal was necessary.

In the summer and fall of 1927 the company was beset with financial troubles. The appellant had been general manager since 1919, vice president since 1922, and president since 1926. When trouble came he was the skipper of the boat. He found himself in the possession of a great number of notes and mortgages and financial statements, signed in blank by the trusting clients of his company. He had many inspection reports, signed in blank by inspectors. His company had an established reputation for fair dealing in the money markets of the world. The rest of the story is so obvious it need hardly be told. An example will suffice: In March, 1927, one Peterson executed a mortgage on his sheep to the Western Agricultural Corporation, a subsidiary of the Western Livestock Loan Company, for $40,-000. This represented an actual loan. Peterson left with appellant notes and mortgages and financial statements, signed in blank, to be used in case of a renewal. In July, 1927, notes for $50,000, secured by what purported to be a first mortgage on the same sheep, signed by Peterson, were sold to various banks in the northwest. In December, 1927, still a third mortgage, signed by Peterson, for $30,000, was sold to a Chi-

cago bank; it was accompanied by a report of an inspection that was never made, and by a financial statement of Peterson that was untrue. The mortgage covered all the sheep Peterson had, and many he did not have. It purported to be a first mortgage; it was in fact a third mortgage on some sheep, and no lien at all on the sheep that did not exist. In January, 1928, a bank at Rock Springs, Wyo., bought another Peterson mortgage on the same sheep for $20,000. The signatures of Peterson were genuine, but he got none of the proceeds of the last three loans; the banks did not get what they paid for. The last three mortgages were not first liens as they purported to be; did not represent actual loans made; were a fraud upon both the banks who thought they were buying genuine loans secured by a first lien, and upon Peterson, whose notes were floated in abuse of trust. The practice of signing instruments in blank had gotten in its deadly work. That the proceeds of the fraud went to the company instead of to the personal profit of the appellant was a circumstance properly and apparently considered by the trial court in imposing sentence; it has no bearing on the question of the guilt or innocence of appellant.

That the appellant concocted and carried out this vicious scheme to defraud those he had taught to trust him, admits of no doubt. That he used the mails is proven by registry receipts; that he contemplated and authorized such use is proven by an office equipped with stenographers and stamps, and by the fact that the nature of the plan required such use. That the indictments fairly advised him of the offenses with which he was charged is proven by a reading of them and by the exhaustive defense which he made, both by cross-examination and through witnesses of his own, although he himself did not give the jury the benefit of his detailed knowledge of the facts in issue. That the court fairly and ably charged the jury is demonstrated by an examination of his charge, by the fact that no exceptions were taken below, and no complaint is lodged here against it. In this situation, we must disregard "technical errors, defects, or exceptions which do not affect the substantial rights of the parties." 28 USCA § 391.

The principal errors assigned will be noticed. It is contended that there was no proof of any scheme to defraud because the purpose that actuated appellant in discounting the notes "under somewhat peculiar circumstances" was to save the company and

thus save its creditors; that appellant was not actuated by hope of personal profit; that, in any event, there was a fatal variance between the proof and the charges laid in the indictments.

The indictments are substantially identical except for the names and dates. The last one charges that the defendant devised a scheme and artifice for obtaining, under the corporate name of Western Livestock Loan Company, money and property, by means of false and fraudulent pretenses, representations, and promises, from the North Side State Bank, of Rock Springs, Wyo., in return for the rediscounting of the Peterson note of January, 1928; that the false representations and promises were "* * * to the effect that (1) said promissory note was the bona-fide obligation of the maker thereof, (2) that the same was sufficiently secured by a bona-fide mortgage upon livestock then owned by said maker of said promissory note, (3) that said promissory note represented a bona-fide loan made by said Western Livestock Loan Company to the maker of said promissory note on the date of said promissory note, (4) that said Western Livestock Loan Company then was a bona-fide and responsible loan company engaged in the business of loaning money upon the security of livestock, and that said Western Livestock Loan Company would save said banking concern from loss on account of its rediscounting said promissory note; whereas in truth and in fact, as said defendants then and there well knew, said promissory note then was not the bona-fide obligation of the maker thereof, but was a fictitious and pretended blank note to which said defendants had secured the signature of said maker as a part of said scheme and artifice, said promissory note was not then sufficiently secured by a bona-fide mortgage upon livestock owned by the maker thereof, but was insufficiently 'secured' by a fictitious and pretended blank mortgage upon livestock already heavily encumbered by mortgage, to which said blank mortgage said defendants had secured the signature of the 'mortgagor' as a part of said scheme and artifice, said promissory note, by reason of the fact that no loan whatever was then made by said Western Livestock Loan Company to said maker, did not represent a bona-fide or any loan made by said Western Livestock Loan Company to the maker thereof, said Western Livestock Loan Company was not a bona-fide or responsible loan company engaged in the business of loaning money upon the security of livestock, but was a mere pretended and fraudulent

concern used by said defendants for the purpose of obtaining money in the manner aforesaid, and said Western Livestock Loan Company, by reason of its then being insolvent and financially irresponsible, would not and could not save said banking concern from loss on account of its re-discounting said promissory note; and that said money and property, when so obtained by said defendants, was, according to said scheme and artifice, to be converted by them to their own use, and said banking concern was thereby to be defrauded of the same." [The numbers are inserted.]

The indictment then charges the use of the mails and sets out, in hæc verba, the letters made the basis of the various counts.

█ Congress has full power to prohibit the use of the mails for any unlawful purpose. It has prohibited their use in execution of a scheme to defraud. Section 315 of the Criminal Code (18 USCA § 338) provides that: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises * * * shall, for the purpose of executing such scheme or artifice or attempting so to do, * * * [use the mails] shall be fined not more than $1,000, or imprisoned not more than five years, or both."

█ If a defendant devises a scheme to defraud, and uses the mails in the execution thereof, the crime is complete. Whether the scheme succeeds or not, whether any one is defrauded or not, whether the defendant personally profits or hopes to profit or not—are all nonessential details. Cowl v. United States (C. C. A. 8) 35 F.(2d) 794; Stunz v. United States (C. C. A. 8) 27 F.(2d) 575; Barnard v. United States (C. C. A. 9) 16 F.(2d) 451; Chew v. United States (C. C. A. 8) 9 F.(2d) 348; Calnay v. United States (C. C. A. 9) 1 F.(2d) 926, 927; Pandolfo v. United States (C. C. A. 7) 286 F. 8; Whitehead v. United States (C. C. A. 5) 245 F. 385; Sparks v. United States (C. C. A. 6) 241 F. 777; Wilson v. United States (C. C. A. 2) 190 F. 427, 433; Lemon v. United States (C. C. A. 8) 164 F. 953. The use of the mails is the gist of the offense; if the scheme is set forth with sufficient particularity to identify it—to enable the defendant to prepare for trial and to enable him to set it up in bar of a later prosecution—it is sufficient. It is not essential that all of the particulars alleged be proven. Havener v. United States (C. C. A. 10) 49 F.(2d) 196, cer-

tiorari denied 52 S. Ct. 24, 76 L. Ed. ——; Cowl v. United States (C. C. A. 8) 35 F.(2d) 794; Sasser v. United States (C. C. A. 5) 29 F.(2d) 76; Brady v. United States (C. C. A. 8) 24 F.(2d) 397, 398; Mathews v. United States (C. C. A. 8) 15 F.(2d) 139; Gardner v. United States (C. C. A. 8) 230 F. 575; United States v. Smith (D. C. Pa.) 222 F. 165. While the proof did not show that the appellant intended to convert the proceeds of his fraud to his own use, as alleged, such fact is not an element of the offense. The offenses proven were abundantly identified by the indictments; the notes sold were described with particularity; the banks to which they were sold were named; the letters were set out in full. The representations proven were alleged, and most of the representations alleged were proven. It was alleged and proven that the notes were not bona fide obligations of the makers to the Western Livestock Loan Company, the payee, as they were represented to be; it was alleged and proven that the notes were not sufficiently secured, in that they were not first mortgages as they purported to be. We need go no further. A crime was alleged; the crime alleged was proven.

Complaint is made because of the admission of evidence concerning transactions other than those set out in the indictments. Much of it was clearly admissible under the familiar rule that in cases where the prosecution must prove a specific intent, evidence of other similar transactions, not too remote in point of time, is admissible to prove the intent or motive of the defendant in the particular transaction for which he is on trial. Coulston v. United States (C. C. A. 10) 51 F.(2d) 178. Appellant assigns as error the failure of the trial court to charge the jury at the close of the trial that such evidence should be considered only so far as it proved intent. It would be enough to say that counsel requested no such charge at that time, and took no exception to the court's failure so to charge. Rule 10 of this court; Order of United Commercial Travelers v. Greer (C. C. A. 10) 43 F.(2d) 499. Toward the close of the trial the court said to counsel, in the hearing of the jury, that he expected to charge the jury as to the purpose of such evidence—that the collateral transactions were admissible as bearing upon the question of whether the method used was "deliberately pursued." We think this was quite as effective as if it had been said in the final charge, although undoubtedly the court would again have so instructed if counsel had recalled it to his mind. A precisely similar situation arose in Latses v. United States, 45 F.(2d) 949, and this court held that there was no error. A part of the evidence of other transactions was admissible for the additional reason that it had probative bearing on the issues of the case, to wit, the correctness of the financial statement of the company and its financial condition. When appellant violated his trust and placed in the hands of bona-fide purchasers these notes signed in blank, the company was liable to the cattleman who had reposed the trust; in some instances neither the books of the company nor its financial statements disclosed such liability. It was therefore entirely proper to prove this undisclosed indebtedness. The same is true of the proof that fictitious stock was issued prior to the examination by auditors, and retired when the examination was completed—it proved that the financial statement of the company was false. There was no error in the admission of this evidence.

Complaint is made because of the admission of the testimony of an auditor as to what the books of the company disclosed. Although there are 90 assignments of error, this alleged error is not assigned; furthermore, most of the evidence went in without objection; under our rules and repeated rulings, the error, if one existed, could not be noticed. But there was no error. There were 75 to 100 of such books of account and accompanying files. What the books disclosed was pertinent evidence as to many of the issues. It was not only proper to use an auditor—it was the only practicable way to get before the jury the evidence in the books. The court amply safeguarded the rights of the appellant by requiring the government to furnish him for the use of his counsel and auditor, a copy of the audit; by assuring appellant access to the books, which were in the court room, for the purpose of checking the audit; and by affording ample opportunity to cross-examine. It is objected that the books were not introduced in evidence; the books were available to both sides; they were identified, and that is sufficient. To introduce them would have been a meaningless formality. An auditor may testify as to what is disclosed by books of account, if the books are identified as those regularly kept in the course of business, and if the books are available for purposes of cross-examination. Beck v. United States (C. C. A. 8) 33 F.(2d) 107, 113; Barrett v. United States (C. C. A. 8) 33 F.(2d) 115; Krotkiewicz v. United States (C. C. A. 6) 19 F.(2d) 421; Arine v. United States (C. C. A. 9) 10 F.

(2d) 778; Levinson v. United States (C. C. A. 6) 5 F.(2d) 567; Lemon v. United States (C. C. A. 8) 164 F. 953, 960.

 It is objected that there was no proof that appellant made the entries in the books nor that he was responsible for them, and cases are cited where defendants were charged with making false entries and proof was properly required that the defendants either made the entries or were responsible for them being made. But there is no such charge here; the contents of the books were offered to prove a fact material to the inquiry. Books of account are often received to prove a material fact, where the opposite party, has no connection with the books or the business reflected by them. Barrett v. United States (C. C. A. 8) 33 F.(2d) 115. It is objected that there is no proof that the books were correct. The objection is wholly without merit. Three witnesses, one of them a bookkeeper and assistant secretary, identified the books as those of the company. There was no objection at the trial to the sufficiency of the identification, nor is error assigned thereon. Such objection cannot be made for the first time in this court. One sound reason for the rule requiring that error be assigned is disclosed by this record. No assignment of error being directed to the identification of the books, the bill of exceptions properly omitted a colloquy between court and counsel, which is set out verbatim in the brief, and in which further identification was waived.

 Complaint is made that there was no proof that the letters were mailed by appellant. The statute reads "place, or cause to be placed" any letter, etc., in the mails. The appellant need not personally have posted them; he need not personally have signed them. It is sufficient if he, in execution of his scheme to defraud, caused the letters to be mailed. This fact, like any other, may be found from circumstances. Levinson v. United States (C. C. A. 6) 5 F.(2d) 567. There is no lack of such evidence in this case; there are registry receipts; the scheme devised was one that required the use of either the mails or express; the appellant used or caused the mails to be freely and widely used for the particular purpose of pawning off spurious paper as genuine.

We have examined the record in this case and are convinced that the appellant was proven guilty of the crime charged, and that he had an eminently fair trial.

The judgment of the court is therefore affirmed.