## TEDESCO v. UNITED STATES.
### No. 9597.

Circuit Court of Appeals, Ninth Circuit.
March 26, 1941.

Rehearing Denied May 13, 1941.

George Mowry and John Mowry, both of Portland, Or., for appellant.

Carl C. Donaugh, U. S. Atty., and J. Mason Dillard, Asst. U. S. Atty., both of Portland, Or., for appellee.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges. ·

GARRECHT, Circuit Judge.

At about the hour of 6:45 p.m. on April 11, 1940, the appellant, a resident in the Palace Hotel in Portland, Oregon, accepted a "collect" telephone call originating in Seattle, Washington, from a person named "Kay," identified as Miss Anne Baker, who was the principal witness in this case. Miss Baker, twenty years of age and a prostitute of more or less experience, after imbibing a "few drinks," telephoned Tedesco from an establishment in Seattle known as the Music Hall. She first became acquainted with the appellant more than two years before, while both were staying at the Palace Hotel in Portland, but had left that city and had not seen nor had communication with Tedesco for approximately two years prior to telephoning him. During the interval Miss Baker had resided in Seattle and Alaska and was plying her profession in Everett, Washington, at the time of the telephone call. They conversed for a period of five minutes, in the course of which she told appellant she had just returned from Alaska, desired to return to Portland, and asked him to come to Seattle or Everett to get her, giving him the address and the times at which she would be found in either place, being in Seattle merely on a visit. Tedesco replied that he would either call for her or send someone to do so.

Shortly thereafter, Tedesco telephoned one Frank Petrone, who was not at home, and Tedesco requested that Petrone be asked to return the call, leaving his telephone number. Petrone's sister took the message and relayed it to Frank, who was visiting with a friend. The Petrone and Tedesco families had been next-door neighbors in the east side of Portland for many years, and both appellant and Frank stayed at the same hotel for a time. Petrone telephoned Tedesco and they agreed to meet at a street intersection in the east side of Portland. Each drove his automobile to the appointed place; each was accompanied by a female friend; each alighted from his automobile, met on the sidewalk, walked a short distance and engaged in conversation. According to the Petrone testimony, which is uncontradicted, Tedesco advised him Anne Baker, who was also known to Petrone, had called him from Seattle, saying she was "broke" and wanted to come to Portland, and Tedesco asked him if he (Petrone) would drive to Seattle to get her. Petrone advised Tedesco that he, too, was "broke," and Tedesco authorized him to go to a certain gasoline service station to fill the tank of his car, get $5 from the service station attendant and charge Tedesco's account. Tedesco also furnished Petrone with the addresses which had been given him by the girl. Petrone induced a friend to go with him, filled the gasoline tank of his car at the service station designated, procured the $5 from the attendant and told the latter to charge the amounts to Tedesco. The attendant did not, however, charge Tedesco's account, but charged Petrone instead, and Petrone paid the bill a few days later. After securing the gasoline and the money, at about 11:00 p.m. Frank Petrone, accompanied by the friend, started to drive to Seattle, at which city they arrived some time after 2:00 a.m. the following day. The Music Hall was closed; so they drove on to Everett, about thirty miles distant, arriving there at about .3:00 a.m. Petrone drove into a service station, inquired for the "Joyce Hotel," which address had been given him by Tedesco, and was informed there was no such hotel in Everett. Across the street was the George Hotel; so Petrone and his companion entered, registered for a room to spend the remainder of the night, and then inquired of the clerk if a girl named Anne Baker resided there. Upon receiving an affirmative answer, the girl was called; shortly thereafter she came to the lobby; she and Petrone recognized one another and engaged in friendly conversation, and he told her Tedesco had sent him. The three left Everett at about 7:30 a.m., and Miss Baker and Petrone arrived in Portland at about 1:30 or 2:00 p.m. and went directly to the Palace Hotel and to Tedesco's room. Petrone's friend, the other passenger, left the automobile at Chehalis, Washington, and did not continue on to Portland with them. Petrone remained in Portland for the remainder of that day and night, but did not see the appellant again until the following morning. At the first meeting, the girl conversed with appellant, who said "he would make the arrangements." Three or four

hours later she talked with Tedesco again, and then she did not see him until the following morning. She stayed at the Palace for the night. In the morning, when she next saw Tedesco, he told her arrangements had been made for her to go to The Dalles, Oregon. At about 2:00 p.m. that day Petrone saw appellant and the Baker girl in a hallway of the hotel and was told by the appellant to drive her to The Dalles, to a place known as the Crescent Rooms, a house of prostitution, referred to in the record as a "sporting house." Petrone and the girl then drove to the named town, about 100 miles east of Portland, in Petrone's automobile. When they reached their destination, the girl left the car and entered the Crescent Rooms, while Petrone remained outside in his automobile. After several minutes Miss Baker reappeared, instructed Frank to drive around to the rear of the building, where they brought in her luggage. Petrone entered the house with her and was introduced to the operator of the establishment; the two women had known each other previously. There was also another girl, a Miss Bates, at this place, with whom Petrone was acquainted. He left shortly thereafter and returned to Portland. That night Miss Baker rested, but on the following night engaged in her calling at the Crescent Rooms. Next day she was arrested; a few days later Petrone was arrested in Portland; the appellant was apprehended at the Palace Hotel in Portland, April 15, 1940. Miss Bates and another woman were with him at the time.

For the purpose of showing intent upon the part of the defendant-appellant, the prosecution introduced as a witness, Miss Bates, who stated she followed the same occupation as Miss Baker. Defense counsel made strenuous objection, and extended argument took place before the court without the presence of the jury or the witness, relative to admissibility. The court admitted the testimony of this witness, "to show the knowledge of the defendant as to what sort of a place the Crescent Rooms was, * * * tending to show his knowledge and acquaintance with" the operator thereof. The jury was recalled, and the witness testified that she was practicing prostitution in Yakima, Washington, in March of 1940, when, at about four or five o'clock in the morning, while "somewhat under the influence of liquor" she telephoned appellant at the Palace Hotel

in Portland, told him she "wanted to make a change" and asked him "if he might suggest some place." Tedesco told her to try the Crescent Rooms at The Dalles, and she called the landlady thereof, went there, and plied her trade. She was present when Miss Baker arrived at Crescent Rooms.

Charles Tedesco and Frank Petrone were, by indictment found by the Grand Jury, charged with conspiracy to violate 18 U.S.C.A. § 398 (commonly known as the Mann Act) in the first count, and in the second with transportation of said Anne Baker in interstate commerce for the purpose of prostitution, etc. Frank Petrone pleaded guilty to both counts, but sentence was withheld pending consideration by the judge of evidence adduced at the trial.

There is no conflict in the evidence and there was no antagonism indicated toward the appellant by any of the witnesses. The making of the telephone call by Miss Baker to Tedesco is corroborated by the public utility; the presence of Miss Baker at the George Hotel in Everett and the arrival there of Frank Petrone is corroborated by an Everett police officer; the purchase of gasoline by Petrone is corroborated by the merchant; and the telephone call from Tedesco to Petrone, by Petrone's sister. The defendant did not testify, and no evidence was introduced in his behalf. Defense counsel moved for directed verdict, but the motion was denied and the cause submitted to the jury after instructions by the court, to which no exceptions were taken. The jury found appellant guilty on both counts of the indictment, and judgment and sentence were entered thereon. Tedesco appeals from that judgment.

The questions involved on this appeal are: (1) Whether the trial court erred in admitting the testimony of witness Bates; and (2) whether there was sufficient substantial evidence to warrant submission of the case to the jury on either count of the indictment.

The appellant argues that the testimony of witness Bates was in no way relevant to any of the charges in the indictment, in no way tended to prove or disprove any material fact in the cause; and that the alleged offenses to which the testimony related were in no way similar to the offenses alleged in the indictment.

It is a general rule of criminal evidence that on the trial of a person ac-

740

cused of crime proof of a distinct, independent offense is inadmissible. Boyd v. United States, 142 U.S. 450, 456-458, 12 S. Ct. 292, 35 L.Ed. 1077; People v. Molineux, 168 N.Y. 264, 61 N.E. 286, 62 L.R.A. 193; 20 Am.Jur. § 302, p. 280. The cases cited by appellant in support of this contention are in substantial accord with the foregoing recital of the general rule on this subject. The general rule, however, is modified by a well-recognized exception thereto, which has the sanction of the best law writers, both judicial and academic. That exception may be stated as follows: "* * * where the intent of the party is matter in issue, it has always been deemed allowable, as well in criminal as in civil cases, to introduce evidence of other acts and doings of the party, of a kindred character, in order to illustrate or establish his intent or motive in the particular act directly in judgment." Wood v. United States, 41 U.S. 342, 360, 16 Pet. 342, 360, 10 L.Ed. 987, per Mr. Justice Story. This exception has been applied with uniformity down through the years. See Neff v. United States, 8 Cir., 105 F.2d 688, 691; Baish v. United States, 10 Cir., 90 F.2d 988, 990; Breedin v. United States, 4 Cir., 73 F.2d 778, 780; Hood v. United States, 10 Cir., 59 F.2d 153, 154; Butler v. United States, 10 Cir., 53 F.2d 800, 805; Hatem v. United States, 4 Cir., 42 F.2d 40, 41; Kinser v. United States, 8 Cir., 231 F. 856, 860; Schultz v. United States, 8 Cir., 200 F. 234, 237; Colt v. United States, 8 Cir., 190 F. 305, 307; Bottomley v. United States, 3 Fed.Cas. 968, 971, No. 1,688. The exception has also been stated negatively— "Relevant and competent evidence of guilt is not rendered inadmissible because it also tends to prove that the defendant committed another offense." Crapo v. United States, 10 Cir., 100 F.2d 996, 1001. See also Minner v. United States, 10 Cir., 57 F.2d 506, 510. In addition, at least two of the authorities offered by the appellant recognize and discuss this exception. Coulston v. United States, 10 Cir., 51 F.2d 178, 180, 181; Paris v. United States, 8 Cir., 260 F. 529, 531. We take the following apt quotation from Jones Commentaries on Evidence, vol. 2, § 624, pp. 1160–1162: "Although the rule [that proof of a distinct, independent offense is inadmissible] is stringent, in criminal cases the conduct of the prisoner on other occasions is sometimes relevant, where such conduct has no other connection with the charge under inquiry than it

tends to throw light on what were his motives and intentions in doing the act complained of. The intention with which a particular act is done often constitutes the burden of the inquiry, and to prove the intent it becomes necessary, in many instances, to extend the examination beyond the particular transaction concerning which the accused is upon trial. For the purpose, therefore, of proving intent, not of proving the act itself, it is often permissible to show other criminal transactions of the same sort springing from like mental condition." See also Wigmore on Evidence, 2d Ed., vol. 1, §§ 300, 302, pp. 608, 611-616; Wigmore's Principles of Judicial Proof, 2d Ed., § 116, pp. 224-228; Atwell, Federal Criminal Law, § 26d, p. 166; 20 Am.Jur. §§ 309, 313, pp. 287, 293-296; 62 L.R.A. 193, 214, note.

In fact, this court once acknowledged it was difficult to determine whether the rule itself or the numerous exceptions thereto were the more extensive. Johnston v. United States, 9 Cir., 22 F.2d 1, 5.

■ For the purpose of proving intent under the exception to the rule the jury should be instructed as to the probative extent of the testimony admitted. Williamson v. United States, 207 U.S. 425, 451, 28 S.Ct. 163, 52 L.Ed. 278; Shreve v. United States, 9 Cir., 103 F.2d 796, 803; Dysart v. United States, 5 Cir., 270 F. 77, 79. Cf. Butler v. United States, 10 Cir., 53 F.2d 800, 805. On this question, the court below. instructed the jury as follows: "With relation to the testimony of Donna Bates, I want to confine the use of that testimony entirely to the question of intent or purpose as it relates to the crimes which are charged in the indictment. Even if you should find that the defendant were immoral or had committed other violations, he is not on trial for those, but you may take the testimony of Donna Bates with what credibility you give her and determine whether or not that throws any light upon the question of the intent of the defendant as charged in the counts of the indictment." The instruction sufficiently advised the jury of their duty in this regard. No exception to any of the instructions was suggested by defendant.

It is, perhaps, unnecessary to mention that any evidence admitted under the exception to the rule which we have before us cannot go to prove the commission of the "act" itself, but only to prove the intent with which the act was done—that the

act itself is assumed to be done. This is so, says Wigmore (on Evidence, 2d Ed., vol. 1, § 302, p. 615), either because the act usually is conceded or the jury are instructed to consider the evidence from the standpoint of intent. Both features are present in this case; first, the instruction to the jury as has heretofore been set out, and secondly, there is no conflict in the evidence at all—the only question for the jury was that of intent.

■ In his printed argument, counsel for appellant repeatedly urges that the Donna Bates incident or transaction was not *similar* to the Baker chain of events, but *dissimilar*, and hence not relevant. Webster defines "similar" as, "1. Nearly corresponding; resembling in many respects; somewhat like; having a general likeness." A critical examination of the sequence of events and the results thereof conclusively demonstrates the similarity; the facts well conform to the definition. In this connection, commenting on situations such as we have here, Dean Wigmore (on Evidence, 2d Ed., vol. 1, § 302, p. 615), had this to say:

"* * * it is at least necessary that prior acts should be similar. * * * [Examples illustrated.]

"It is just this requirement of similarity which leaves so much room for difference of opinion and accounts for the bewildering variances of rulings in the different jurisdictions and even in the same jurisdiction and in cases of the same offense. Some judges incline to treat the judicial test of probative value as identical with the common sense test, and to admit such instances as bear a similarity liberally interpreted by the standard of every-day reasoning. Other judges set their faces firmly against every instance which is not on all fours with the offense in issue, regardless of the consideration that justice consists quite as much in protecting the public against evil doers as in showing mercy to those whose guilt has been more or less skilfully concealed."

In conclusion the appellant argues that "there was no substantial evidence sufficient to warrant the submission of either count of the indictment in this case to the jury" and urges that the facts are as consistent with innocence as with guilt and, therefore, insufficient to sustain a conviction.

■ The Circuit Court of Appeals for the Second Circuit, in United States v. Grace, 73 F.2d 294, 295, discussed the offense covered by 18 U.S.C.A. § 398: "The statute makes the intent and purpose an element of the crime, and, if the journey was planned with no immoral purpose at the time, no crime was committed no matter what may have occurred thereafter. It is the immoral purpose which renders such interstate commerce criminal. The immoral relationship, standing alone, unconnected with interstate commerce, does not violate the act. * * * Inducing a girl to go from one state to another with any other purpose, except the formed intent at the outset, is insufficient to constitute a violation of the statute. * * *" Therefore, "The essential elements of the offense as defined in the statute are (1) knowingly transporting in interstate commerce a woman or a girl (2) for the purpose of prostitution or debauchery or for any other immoral purpose." United States v. Lewis, 7 Cir., 110 F.2d 460, 462. The uncontradicted evidence proves beyond a reasonable doubt that the Baker girl was transported from the state of Washington, where she was practicing prostitution, to the state of Oregon, where she practiced prostitution; that Tedesco procured Frank Petrone to furnish the transportation; that Tedesco instructed Petrone to deliver Miss Baker to a house of prostitution. In Shama v. United States, 8 Cir., 94 F.2d 1, 4, it is said:

"Appellant invokes the rule that when all of the substantial evidence is as consistent with innocence as with guilt it is the duty of the appellate court to reverse a conviction. [Cases cited.]

"The evidence in this case can be deemed consistent with innocence only if it be assumed that at the time of buying the railroad ticket Shama intended that the woman's employment be for no immoral purpose, an intention which he subsequently changed. It is well settled that in prosecutions for this offense the jury may infer intent from all the circumstances in evidence. [Cases cited.]"

Furthermore, the purpose or intent in prosecution for transporting a woman in interstate commerce for immoral purpose may be proved by circumstantial evidence (Aplin v. United States, 9 Cir., 41 F.2d 495, 496), in which class stands the Bates testimony. And in reaching their conclusion the jury were entitled to consider what Miss Bates did after arriving at

her destination. Kelly v. United States, 9 Cir., 297 F. 212, 213.

The facts herein recited render unnecessary any discussion of the sufficiency of the evidence to sustain conviction under the conspiracy count.

The judgment of the court below is affirmed.