**HARGETT et al. v. UNITED STATES.**

No. 13028.

United States Court of Appeals
Fifth Circuit.

Aug. 5, 1950.

---

Roy L. Smith, Phenix City, Ala., J. A. Walker, Jacob Walker, Jr., Opelika, Ala., A. L. Patterson, Phenix City, Ala., for appellants.

Hartwell Davis, Asst. U. S. Atty., Montgomery, Ala., for appellee.

Before HOLMES, WALLER, and BORAH, Circuit Judges.

WALLER, Circuit Judge.

The sequence of events that occurred in and around that home of Pete Hargett in Phenix City, Alabama, on the afternoon of March 3, 1949, demonstrates that the oft-repeated statement that one is presumed to have intended the natural and normal consequences of his act cannot be universal in its application.

Although Grady Cook, an Alcohol Tax Unit Investigator from Columbus, Georgia, was a stranger to Pete Hargett, the latter's penchant for handling illegal liquor and his other activities in contrariety to law were not unknown attributes to Cook who, with two state revenue officers, on the occasion in question, in returning from a mission for the purpose of identifying an inmate in jail at Opelika, concluded that while in the vicinity of Phenix City the time was propitious to ride by the Hargett home to see whether or not they could locate, in and around his premises, certain automobiles that the officers thought had been involved in the running of illegal liquor. On account of the fact that several cars were parked in the yard of, and in the streets adjacent to, the Hargett home, the investigation was prolonged, so while Cook drove the car several times around the square and by the house, one of the revenue agents undertook to write down the license tag numbers, while the other took note of the make and model of the various cars. The agents in thus circling the house aroused either the curiosity, apprehension, or ire of Pete, his brother, Guy, and another alleged to be the appellant, Beck, with the result that when the agents, in making their fourth trip around the place, approached the intersection of the narrow street on the west side of the Hargett house, a black Ford, driven by some person then unknown to the officers, turned into that street, followed by Cook's car. When the black Ford had gotten opposite the Hargett place, it stopped and backed diagonally across the street, thus blocking passage by the officers. In order that the blockade would be more effective, the driver of the Ford thereupon alighted, pulled an automatic pistol from his belt, and, with same drawn,—but not pointed at the officers—stood beside his car. At or about this juncture reinforcements in the persons of Pete Hargett and his brother, Guy,—according to the testimony of Officer Cook—appeared in the front yard. The yard was raised two or more feet above the street level, but the officer testified that by bending over and looking up he could see that Pete had a revolver in his hand, while Guy had a pistol in a holster hung on his left hip. When Pete called out, "What the hell do you want?" Cook replied, "This is G. C. Cook, Federal officer. I am just riding around. Get that car out of the street." Upon the announcement that the circling car contained a Federal officer, the driver of the black Ford put his pistol back in his belt, got in the Ford and sped rapidly away. The officers pursued, but failed to overtake him.

The evidence is undisputed that the Hargett brothers thereupon went back into the house. The armed man standing beside the Ford was later identified as Beck, one of the appellants. Although the testimony of the officer is that all three of the men were armed, and that Beck and Pete Hargett each had a pistol in his hand, there is no testimony that either of them ever pointed it at the officers or threatened to shoot them, and no hostile act, word, or gesture was ever made by either of the three men

after learning that a Federal officer was an occupant of the car.

It should now be stated that at the time the Federal officer and his assistants were circling the Hargett premises, a lottery, contrary to the laws of Alabama, was being conducted within. In that home, revealed by the photographs to be roofed with tin and of exceedingly humble type and proportions, there was a sum in excess of $30,000 in cash, according to the uncontradicted testimony of the defendant, Hargett. Investigator Cook admitted that there was a stack of money "this high" on the table. The evidence establishes without contradiction that several witnesses had noticed a car in which three men were continuing to circle and to display an odd interest in the premises and that these witnesses had called Pete Hargett's attention to that phenomenon.

Pete testified that he became apprehensive that someone was preparing to rob him.[1] Since the evidence is undisputed that he had no knowledge that any officer was in the circling car, and since at that time there were large sums of money in the house—later taken into possession by the Sheriff's officers—this apprehension would appear to be quite reasonable.

The evidence shows without dispute that when these men learned that a Federal officer was in the automobile no resistance or hindrance was thereafter made—on the contrary one of the appellants left the scene in great haste and clearly demonstrated that he wanted no traffic at all with Federal officers. Upon this evidence Pete Hargett and Beck were convicted of forcibly assaulting, resisting, opposing, impeding, intimidating, and interfering with "Grady Cook, an investigator of the Alcohol Tax Unit, of the Treasury Department of the United States, while engaged in the performance of his official duties, and in the commission of such act the defendants did use deadly and dangerous weapons" as denounced by Section 111, Title 18, U.S.C.A.[2]

In view of the undisputed evidence that neither of the defendants knew, or had any reason to suspect, that there was a Federal officer in the car which had persistently circled the house; that the inquisitiveness displayed by the occupants of the circling car was such as was calculated to arouse an apprehension of an attempted robbery; plus the uncontroverted fact that the men ceased all resistance when the official identity of one of the occupants of the car was made known; we have been impelled to scan the record critically in order to see if there is any substantial basis for a finding of guilty. Our study of the record convinces us that the case was, in no inconsiderable part, tried upon Pete Hargett's extensive criminal record, in the presentation

1. Pete Hargett testified:
"Q. When did you first see that car? A. Around 4:30 I think. I had been informed previously there was a suspicious car riding around my house by Mrs. Fuller, with their minds concentrated altogether on my place looking in the doors and the windows. They would almost come to a stop every time they come by.
"Q. Did you see the car? A. Yes, sir.
"Q. When did you see this car? A. About five minutes after Mrs. Fuller told me I sat down by the window facing the street and the car came by with three men in it. I could not tell who they were. They were looking in the back windows, and so I tried to see what kind of tag they had on the car.
"Q. Did you recognize it to be a Georgia tag? A. I went to the front door but time I got to the front door they had passed the house. I could see only part of the back of the car. They were acting so suspiciously I thought it might be somebody attempting to rob me. About five minutes later they went up to 14th Street or near up there some place, and they came back.
"Q. Just about a block away? A. Yes, sir. But at the time they first passed I went back in the back room of the house. The colored boy hollered back through the hall, 'Mr. Pete, that same car is coming back,' so I just—myself and most everybody in the back room got up and came on the front porch. Guy and I walked into the front yard about three or four feet from the steps, which was about 30 or 35 feet from where we were standing to where the car was parked at."

2. It appears that Section 111 of Title 18 is a compilation of Sections 118, 121, and 254 of Title 18 before the adoption of the new criminal code.

of a portion of which the prosecuting attorney seemed to display more zeal for a conviction than for the application of the appropriate rules of evidence.

Hargett, on cross examination, readily admitted to the prosecuting attorney: that in 1933 he was convicted of a conspiracy to violate the National Prohibition Act and sentenced to two years in the penitentiary; that in 1937 he was convicted of robbery at Columbus, Georgia, and sentenced to an imprisonment of five to ten years; that in Raleigh, North Carolina, he was convicted of burglary with explosives and received a sentence of seven to ten years; that in 1945 in Opelika, Alabama, he was convicted of violating internal revenue laws and sentenced to serve two years; and that he was also convicted of assault and battery in Columbus, Georgia, and received a sentence of one year and a fine of $500, which, in the words of the prosecuting attorney, was "for the same type of offense you are charged with here"; and that he, at that time, had two cases [the type of which is not specified] pending against him. Notwithstanding the fact that these admissions must have hopelessly damned Hargett's credibility in the minds of the jury, the prosecuting attorney was not content thus to let the admitted convictions of felonies serve their fulfilled and only purpose of impeaching his credibility, but he, over objection, went into the lurid details of the instance in Columbus, Georgia, in 1947, when Guy and Pete Hargett, with pistols in hand, stood off two city policemen who sought to arrest them and for which act Pete had previously testified that he had been convicted and had received a sentence of two years. One of these two policemen was put on the stand in order to present the thrilling details that led to the conviction that Pete had already freely admitted. It, therefore, seems that the policeman's testimony was injected into the case solely for the purpose of prejudicing the jury. Indeed, the prosecuting attorney, when objections were interposed and disregarded, stated: "I just wanted to show his violent, turbulent, blood-thirsty nature and disposition in regard to officers, if Your Honor please. It is just the same type of thing he is charged with here." This, notwithstanding the fact that Hargett had not put his character in issue.

Not content with having gone into the stirring details of this offense in Columbus, the prosecuting attorney then was allowed to show by the defendant that when some officer came out in Hargett's neighborhood to serve subpoenas, Hargett undertook to make the officer a present of a sum of money for the purpose of getting the officer to "do what he could in Opelika" for him, although the defendant was in no wise charged with attempting to obstruct justice by bribery.

■ Thus it was that Hargett, who frankly admitted numerous convictions of felonies, and which convictions were admissible solely for the purpose of impeaching his credibility,[3] when put on trial for forcibly resisting, impeding, etc., Grady Cook, an investigator of the Alcohol Tax Unit, in Phenix City, Alabama, on March 3, 1949, was, to all intents and purposes, also put on retrial for resisting the policemen in Columbus, Georgia, on October 18, 1947, in order to show the jury his "violent, turbulent, blood-thirsty nature and disposition in regard to officers."

Even though there are cases involving fraud and the use of the mails with intent to defraud and similar cases wherein similar acts of the defendant which would constitute separate offenses might be admissible for the purpose of showing intent, as in the case by this Court of Weiss v. U. S., 122 F.2d 675, nevertheless the rule discussed in such cases can have no possible application here under the Government's theory that scienter or intent to assault a Federal officer is unnecessary. Moreover, the proof that Brown intended to assault Jones in 1947, for which he had a motive, is no proof whatsoever that Brown had the same intent or motive to assault Jenkins in 1949.

The foregoing was not permissible under the rule well stated by this Court in Railton

3. See Russell v. United States, 5 Cir., 146 F.2d 129; Matthews v. U. S., 5 Cir., 145 F.2d 823.

v. U. S., 127 F.2d 691, 692, wherein the Court said:

"* * * We recognize the rule that light may be sought in this way to show motive or intent, or a system of crime, in some cases. Weiss v. United States, 5 Cir., 122 F.2d 675. But it is a fundamental rule of criminal law that guilt of another offense cannot generally be proven to show guilt of the offense charged in the indictment. Boyd v. United States, 142 U.S. 450, 12 S. Ct. 292, 35 L.Ed. 1077; Bird v. United States, 180 U.S. 356, 21 S.Ct. 403, 45 L.Ed. 570; Scheinberg v. United States, 2 Cir., 213 F. 757, Ann.Cas.1914D, 1258; Wolf v. United States, 2 Cir., 290 F. 738; Fish v. United States, 1 Cir., 215 F. 544, 545, L.R.A. 1915A, 809; Tedesco v. United States, 9 Cir., 118 F.2d 737. This is true even when guilt of the other offense has been established by a conviction, or is admitted. * * *

"* * * It is certainly 'more probable' that a crooked official did steal than if he were an upright one. Yet our law forbids these very premises. It cannot be shown that the accused has committed other similar crimes to show that it is probable he committed the one charged. So his general bad character cannot be proven against him for that purpose, but only in reply to his own attempt to show in his defense a general good character. * * *"

In 20 Amer. Jur., Evidence, § 324, it is stated: "* * * The state cannot, however, in a criminal prosecution in its evidence in chief introduce evidence tending to establish the bad character of the accused. It is only when the accused introduces evidence to show that his character is good that the state may attack his character."

20 Amer. Jur., Evidence, § 325, states, in part: "* * * The character of a person accused of a crime is not a fact in issue in a prosecution for such crime, and the state cannot, in its evidence in chief, for the purpose of inducing belief in the defendant's guilt, introduce evidence tending to show his bad character or that he has a tendency or disposition to commit the crime with which he is charged. It is clear that because an accused person may have a bad character it does not necessarily follow that he is guilty of the particular offense charged. * * *"

And in 20 Amer. Jur., Evidence, § 309, the following statement is found: "To admit proof of crimes other than the particular one with which the accused is charged would inevitably lead to the inference that the depravity which motivated the previous crimes continued and was the basis for the commission of the particular crime for which the accused must stand trial, and the courts have repeatedly affirmed the impropriety of raising such a presumption of guilt by proof of other crimes. Furthermore, it is clear that evidence of other crimes compels the defendant to meet charges of which the indictment gives him no information, confuses him in his defense, raises a variety of issues, and thus diverts the attention of the jury from the charge immediately before it. * * *"

In Boyd v. U. S., 142 U.S. 450, 12 S.Ct. 292, 295, 35 L.Ed. 1077, the Supreme Court said: "* * * Whether Standley robbed Brinson and Mode, and whether he and Boyd robbed Hall, were matters wholly apart from the inquiry as to the murder of Dansby. They were collateral to the issue to be tried. * * * Those robberies may have been committed by the defendants in March, and yet they may have been innocent of the murder of Dansby in April. Proof of them only tended to prejudice the defendants with the jurors, to draw their minds away from the real issue, and to produce the impression that they were wretches whose lives were of no value to the community, and who were not entitled to the full benefit of the rules prescribed by law * * *. However depraved in character, and however full of crime their past lives may have been, the defendants were entitled to be tried upon competent evidence, and only for the offense charged."

We deem it unnecessary to pass upon all of the specifications of error inasmuch as the instruction of the trial Court to the jury, that if the defendants did act for the purpose of obstructing or impeding any person, whoever he might be, who later turned out to be a Federal officer, involved in the discharge of his duty, then the defendants had committed a Federal offense

864

under the law, will require a reversal of the judgment. On the merits the case depends upon the answer to the question of whether or not it was necessary to prove that the defendants knew, or should have been deemed to know from the facts and circumstances, that they were assaulting or resisting a Federal officer in the discharge of his duty. If scienter was a requisite to due process of law, then without question the motion of the defendants for an acquittal should have been sustained and the charge of the Court above mentioned was erroneous. The United States Attorney, meeting the issue squarely, does not attempt to show that the defendants knew that the men in the circling automobile were officers, Federal or State. He insists that such knowledge was not necessary in order to convict under the statute, and he relies to support his position chiefly on the opinion of the Circuit Court of Appeals in the now celebrated case of McNabb v. United States, 6 Cir., 123 F.2d 848, reversed on other grounds, 318 U.S. 332, 333, 63 S.Ct. 608, 87 L.Ed. 819 and certiorari denied, after retrial, 323 U.S. 771, 65 S.Ct. 114, 89 L.Ed. 616.

■ But McNabb v. U. S., supra [123 F.2d 855], was a murder case, and not one for resisting a Federal officer. In that case the defendant slew an Alcohol Tax Unit Investigator, in which the Sixth Circuit held that in order to convict the slayer of murder it was not necessary to show that the killer knew that he was killing an officer, agent, or employee of the United States, since "The ingredient of the crime condemned is the unlawful killing of a human being in some manner defined in Sections 452 and 453." It is elementary that it is not essential to prove in every murder case that the defendant knew the person whom he slew. Moreover, the great weight of authority is against the Government's contentions.

Pettibone v. U. S., 148 U.S. 197, 13 S.Ct. 542, 543, 37 L.Ed. 419, is the leading case and cleary holds that scienter is necessary in a prosecution for obstruction of officers of the United States. The statute involved in the Pettibone case provided as follows: "Sec. 5399. Every person who corruptly, or by threats or force, endeavors to influence, intimidate, or impede any witness or officer in any court of the United States, in the discharge of his duty, or corruptly, or by threats or force, obstructs or impedes, or endeavors to obstruct or impede, the due administration of justice therein, shall be punished by a fine of not more than five hundred dollars, or by imprisonment not more than three months, or both." [Sec. 5399, Revised Statutes of the U. S.]

Concerning this very similar statute Chief Justice Fuller, speaking for the Court, said:

"Undoubtedly it is a condition of penal laws that ignorance of them constitutes no defence to an indictment for their violation, but that rule has no application here. * *

"It is insisted, however, that the evil intent is to be found, not in the intent to violate the United States statute, but in the intent to commit an unlawful act, in the doing of which justice was in fact obstructed, and that, therefore, the intent to proceed in the obstruction of justice must be supplied by a fiction of law. But the specific intent to violate the statute must exist to justify a conviction, and, this being so, the doctrine that there may be a transfer of intent in regard to crimes flowing from general malevolence has no applicability. 1 Bish. Crim. Law, § 335. It is true that, if the act in question is a natural and probable consequence of an intended wrongful act, then the unintended wrong may derive its character from the wrong that was intended; but, if the unintended wrong was not a natural and probable consequence of the intended wrongful act, then this artificial character cannot be ascribed to it, as a basis of guilty intent. The element is wanting through which such quality might be imparted."

The Court of Appeals of the Fifth Circuit has construed scienter as a material ingredient of a statutory offense relating to obstruction of justice in Odom v. U. S., 116 F.2d 996. See also: Palmquist v. U. S., 149 F.2d 352; Gay v. U. S., 12 F.2d 433; Moore v. U. S., 57 F.2d 840; and Cook v. U. S., 117 F.2d 374.

The Sixth Circuit, the author of the Mc-Nabb case relied upon by the United States, held in Sparks v. U. S., 90 F.2d 61, that scienter was necessary in violation of Title 18 U.S.C.A. § 254.

The Seventh Circuit has held, in Chiaravalloti v. U. S., 60 F.2d 192, that in a violation of Section 91 [now § 201] of Title 18, U.S.C.A., involving bribery of a Federal officer, scienter was necessary.

The Eighth Circuit has held similarly in Walker v. U. S., 93 F.2d 792.

In U. S. v. Page, D.C., 277 F. 459, it was held (by the District Court, W.D. of Virginia) that an indictment under Section 65 of the Criminal Code [now 18 U.S.C.A. § 2231] for forcibly resisting an officer must allege that the accused knew the person assaulted was an officer.

In a Circuit Court case, U. S. v. Taylor, C.C., 57 F. 391, 393, involving the obstruction of Federal officers, the court said: "To assault an officer of the United States while happening to be engaged in performing some duty enjoined upon him by federal statute is only a common-law offense; and it becomes a statutory offense only when the assailant knows that the assailed is an officer of the United States, and makes the assault for the purpose of obstructing the officer in the discharge of duty imposed by laws of the United States. In such cases the scienter is an essential ingredient of the offense."

In 39 Amer. Jur., Obstructing Justice, § 13, this language is used: "* * * If an officer does not disclose his authority and the accused does not know that he is an officer and is attempting to arrest him for an offense, he has a right to resist the arrest with whatever force is necessary."

In the present case the proof shows without dispute that as soon as the officers made known their identity, whatever of resistance, if any theretofore portending, immediately ceased. Stopping a car, containing strange men, that was cruising suspiciously around one's home, in which there were large sums of money; inquiring what the purpose of the cruise was; being prepared to resist in the event the mission was unlawful; and immediately desisting and withdrawing upon ascertainment that the cruising car contained a Federal officer, cannot be considered assaulting, resisting, opposing, impeding, intimidating and interfering with a Federal officer as contemplated by the statute here invoked.

A motion for a judgment of acquittal should have been granted under the evidence in this case. The United States should have been required to prove that the defendants knew, or had knowledge of such facts as to put them definitely on inquiry, that the circling car contained Federal officers in the discharge of their duty before a conviction could have been sustained.

The judgments of the lower court are vacated and the cause reversed for further proceedings not inconsistent with the views herein expressed.

Reversed and remanded.