**In the Matter of Claude C. WILD, Jr., a Member of the Bar of the District of Columbia Court of Appeals.**

**No. M–9–74.**

District of Columbia Court of Appeals.

Submitted March 24, 1976.

Decided July 13, 1976.

Fred Grabowsky, Washington, D. C., for petitioner.

James R. Murphy, Washington, D. C., for respondent.

Before KELLY, KERN and MACK, Associate Judges.

KELLY, Associate Judge:

Respondent Claude C. Wild, Jr., former Vice-President for Government Relations of the Gulf Oil Corporation, pled guilty before Judge George L. Hart, Jr., of the United States District Court for the District of Columbia, to a violation of 18 U. S.C. § 610,[1] a misdemeanor, and was fined $1,000. Upon receipt of a certificate of respondent's conviction, this court referred the matter to its Disciplinary Board pursuant to Disciplinary Rule XI, Section 15(5). Formal disciplinary proceedings were thereafter instituted and the matter was heard by a Hearing Committee of the Board. As this Committee stated in its report to the Board:

> There is no dispute that Claude C. Wild, Jr., did make contributions to the reelection campaign effort on behalf of President Nixon—to the Committee to Reelect the President; that he did so after being solicited by two Cabinet officers (Attorney General John Mitchell and Secretary of Commerce Maurice Stans) and their agents, and that he did so out of a fear of what would happen if he did not take such action. [Footnote omitted.][2]

After taking into account all mitigating circumstances, the Committee found that respondent Wild had, as charged violated Disciplinary Rule 1–102(A)(3), (4) and (5),[3] and recommended that he be suspended from the practice of law for a period of

---

1. Illegal campaign contributions.

2. Report of the Hearing Committee, p. 3.

3. Disciplinary Rule 1–102(A)(3), (4) and (5) provide:
   Misconduct.
   (A) A lawyer shall not:
   \*   \*   \*   \*   \*

(3) Engage in illegal conduct involving moral turpitude that adversely reflects on his fitness to practice law.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.

two years. The Disciplinary Board reviewed the finding and recommendations of the Hearing Committee and, after briefing and argument of counsel, adopted its findings of fact but submitted to this court a recommendation that respondent Wild be suspended from practice for only one year. One Board member dissented, stating that this matter was no different than that of Richard G. Kleindienst, which ultimately resulted in a 30-day suspension,[4] and suggested that a similar sanction would be appropriate here. The dissenting member was concerned that a different approach would make the "Bar and the entire disciplinary process suspect."[5]

The Disciplinary Board found it unnecessary to determine whether respondent's conduct involved moral turpitude (DR1–102(A)(3)) or was prejudicial to the administration of justice within the meaning of DR1–102(A)(5) since it found a clear violation of DR1–102(A)(4) in respondent's secretly transferring funds of a Bahamian subsidiary of Gulf Oil Corporation to President Nixon's Reelection Committee and directing Maurice Stans to list the contributions as made by "employees of Gulf Corporation"—a patent effort to circumvent the law in violation of the public interest and the public good.[6] Respondent contends that this finding overlooks the fact that he acted only as a conduit of the funds and the question of how the contributions were to be listed is immaterial to the charge before the Board. It was the Board's finding, however, that the misrepresentation and deceit was not between the contributor and recipient of the funds but to the corporation's shareholders and to the public "in an effort to prevent public disclosure of a political gift by a corporation."[7]

Respondent does not contend that no disciplinary action should be applied in this case. He does urge, however, that with the *Kleindienst* case as precedent and the comparison of his misconduct with that of Richard Kleindienst, a token suspension of thirty days "would serve as sufficient disciplinary action in the maintenance of the distinction between fitness and punishment."[8]

In considering the appropriate disciplinary action to take, the Board made the following statement, with which we are in full agreement:

> We do not read the *Kleindienst* Case as setting the disposition standard for cases involving criminal conduct affecting the political process. We believe that the proper discharge of our function requires that we recommend what appears to us to be the appropriate and reasonable sanction under all the circumstances of the particular case. In arriving at a recommendation for discipline, the specific misconduct involved must be weighed against the purposes of disciplinary proceedings. The discipline imposed should be commensurate not only with the need to maintain the integrity of the profession and the protection of the public, but with the need for the deterrence of other lawyers from engaging in similar misconduct. . . .[9]

The *Kleindienst* case is unique in its holding that the Board's recommendation there "appear[ed] to have been underpinned by punitive considerations"[10] and

---

4. *See District of Columbia Bar v. Kleindienst,* D.C.App., 345 A.2d 146 (1975).

5. Findings and Recommendations of the Disciplinary Board, p. 6.

6. The fact that respondent's duties as Vice-President for Government Relations did not include the active practice of law was not considered germane to the issue before it. *Id.* at 3. *See In re Kirtz,* 494 S.W.2d 324 (Mo.1973).

7. Findings and Recommendations of the Disciplinary Board, p. 3.

8. Brief of Respondent, pp. 5–6.

9. Findings and Recommendations of the Disciplinary Board, p. 4.

10. *District of Columbia Bar v. Kleindienst, supra* at 148.

that a one-year suspension would be primarily punitive and hence inappropriate. This court reasoned, too, that:

> In this matter a criminal prosecution was brought; it became the appropriate vehicle for punitive determinations. Any further attempt to punish in this proceeding inferentially would carry with it an implied expression of disagreement with the trial court's sentencing judgment [$100 fine and one month imprisonment, suspended, with one month's unsupervised probation], which would not be an appropriate consideration in our exercise of disciplinary judgment. . . . [Footnote omitted.] [11]

Following this reasoning, it is appropriate to note that during the sentencing proceedings which culminated in the imposition of a maximum fine on respondent Wild, Judge Hart said, in passing: "You know, you say this is not a crime of violence. Of course, it is not, but it may be a much worse crime because what you are doing is corrupting our government."

■　We have recently been reminded, in the case of an attorney suspended for one year from practice before the Federal Trade Commission, that: "[C]ontrary to the Commission's concept, disciplinary proceedings 'are adversary proceedings of a quasi-criminal nature,' and '[d]isbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer.'" [Footnote omitted.] *Charlton v. Federal Trade Commission,* —— F.2d —— (D.C.Cir., No. 74–1571, March 10, 1976), quoting from *In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968). Because this is so, a person subject to disciplinary charges is entitled to due process. *In re Ruffalo, supra. See also Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967).

■　We do not view the *Kleindienst* case as mandating a like sanction for respondent Wild. Wild was instrumental in making secret campaign contributions totalling $100,000 to the Committee to Reelect the President.[12] He knowingly engaged in a deliberate and designed course of illegal conduct, albeit under some pressure, and thereafter attempted to prevent public disclosure of that fact. His conduct involved deceit and misrepresentation within the meaning of DR1–102(A)(4) and directly reflects on his ethical fitness to practice law.[13] As stated above, we agree with the Disciplinary Board's perception of its general function in all disciplinary proceedings and its expressed opinion that each case must be decided on its own facts. It has made the delicate judgment that respondent Wild should be suspended for one year. We are of a like opinion and hereby impose a one year suspension upon the respondent.

*So ordered.*

KERN, Associate Judge (concurring in part and dissenting in part):

I agree that respondent's misconduct necessitates suspension from the practice of law in the District of Columbia but I disagree with the length of time adopted by the Court for that suspension.

Preliminarily, I note that Disciplinary Rule XI, Section 4(3) prescribes that the Disciplinary Board review the findings and recommendations of its hearing committee and then prepare and forward to this court "its own findings and recommendations." The rule provides that thereafter this court "shall review such findings and recommendations on the basis of the record and shall enter an appropriate order determining the

---

11. *Id.* at 149.

12. The money was ultimately returned to Gulf Oil by the Committee to Reelect and respondent Wild paid Gulf Oil $25,000 toward its legal expenses in the criminal case. Gulf Oil pled guilty to making the same $100,000

campaign contribution as well as making a $15,000 contribution to a representative of the Mills for President Committee and $10,000 to a representative of the Citizens for Jackson Campaign Committee.

13. *See* D.C.App. R. XI, Sec. 2.

proceedings." Thus, I view this court as having the ultimate responsibility for making the "appropriate" determination in each disciplinary proceeding; further, I believe that determination necessarily depends on the facts peculiar to each such proceeding.

The record in the instant case reflects that respondent pled guilty to a criminal offense, the elements of which were described by the federal judge accepting the plea as follows:

> You being an officer and Vice President of Gulf Oil, consented to the making by that corporation of a contribution in the amount of $100,000 to the Finance Committee for the Reelection of the President . . . in violation of the statute.

The applicable statute, 18 U.S.C. § 610 (1970), proscribes "any corporation" from making a contribution in any political election and provides that "every officer" of any corporation consenting to a contribution is guilty of a misdemeanor, or "if the violation was willful," a felony. The special prosecutor in respondent's case advised the federal trial court that respondent "came forward voluntarily . . . and disclosed the contributions charged . . . and in light of that cooperation which has been complete and voluntary" had been charged only with a misdemeanor violation.

The record before us further reflects the circumstances of the corporate contributions to which respondent consented.[1] He was aware of their illegality when made, and he acknowledged "I should have been stronger in resisting . . . what could be characterized as a form of extortion in a way." When asked before the hearing committee to "be a little more specific about the type of reprisal that you thought was possible if you didn't make the requested contribution," respondent under oath replied:

> [K]nowing something of the attitudes of those in power, the first four years of that, the Nixon Administration, it was desirable not to get on their blacklist, so to speak and . . . there are many things I suppose they could do . . . ..
>
> \* \* \* \* \* \*
>
> I knew others were being approached and that if they made a contribution and I didn't, where does that put me in relationship to my competitors? There are 60-some agencies in the government that are important to the oil business . . ..

Respondent, in his sworn testimony before the Senate Select Committee on Presidential Campaign Activities, which is a part of the record before us, related that in 1971 an agent of the Committee to Reelect the President (CREP), Mr. Nunn, visited respondent and asked for a contribution of $100,000 from Gulf Oil for the 1972 election, suggesting that he contact the then Attorney General Mitchell to varify the bona fides of CREP. Respondent met with the Attorney General at the Department of Justice who confirmed the existence of CREP as a reelection operation, Mr. Nunn's participation in that operation and that "he [Mitchell] had full confidence in Mr. Nunn." Respondent, concluding "that this is something I had better do," obtained $50,000 in cash from one of the many foreign and wholly owned subsidiaries of Gulf (which amount was charged to "miscellaneous expenses"), and gave the money to Nunn.

In 1972, according to respondent, he was contacted by the then Secretary of Commerce Stans who indicated his hope of obtaining $100,000 from large American corporations and $50,000 more from Gulf; respondent, who "considered it considerable pressure when two Cabinet officers and an

---

1. The record indicates that other senior Gulf officials were unaware of the contributions.

agent of one of the committees . . . [were] asking me for funds," obtained the cash in the same way as before and delivered it to Stans. Subsequently, when asked by Stans how to report the source of the $100,000 contribution in order to conceal the fact it was a corporate contribution, respondent suggested it be listed as coming from "employees of Gulf."

The denouement of the criminal case was that CREP gave Gulf back the $100,000 contribution; Gulf also received $25,000 from respondent, "to repay the corporation for the legal expenses involved and the fine which they had to pay," thus apparently making Gulf and its stockholders financially whole. On the other hand, respondent's employment as Vice-President with Gulf was terminated, he pled guilty to committing a crime, and he was fined $1,000.

Absent extraordinary circumstances, which are not present here, the commission of a crime by an attorney requires both for the maintenance of the integrity of the profession and the protection of the public against future misconduct by other attorneys, the termination of his licensure to practice law. Cf. District of Columbia Bar v. Kleindienst, D.C.App., 345 A.2d 146 (1975). The critical issue becomes then the nature of that termination, i. e., disbarment or suspension.[2] The Board's hearing committee and the Board itself recommended suspension for respondent and I agree upon the record here; this was not a case of a corporation, at the instigation of one of its officers, pumping streams of money into the political process to pollute it but rather in my view an extortion conducted by politicos occupying important executive department offices and armed with considerable governmental might vis-a-vis businesses. (As Senator Ervin pointed out in the Senate hearings during respondent's testimony, the Secretary of Commerce "has quite a voice" in fixing oil quotas.) While respondent at first concealed the violation of law, he did come forward voluntarily, according to the Special Prosecutor, and cooperated completely.

If suspension seems appropriate here to protect the Bar's reputation and to discourage illegal acts by lawyers in the future, the question becomes then for how long a period that suspension should be. In determining that issue I believe attention should be given to the nature of respondent's misconduct and both his past history and possible future in the profession. Respondent did knowingly violate a statute but the violation occurred in that murky area of political fund-raising, where apparently it is *not* more blessed to give than to receive,[3] and where considerable reformation has seemingly occurred. Respondent in no way was guilty of over-reaching his client or failure to advance his client's cause; if anything, his zeal to protect his client's interest was excessive.

The record further reflects that upon graduation from law school he became a "legislative assistant" to a trade association and during that employment was not involved in "legal representation in any way." Thereafter, he was a "legislative representative" for Gulf, ultimately becoming Vice-President for Government Relations, and has never "engaged in the active practice of law in the District of Columbia." As of the time of respondent's testimony before the Board's hearing committee he testified that he was setting up an office and going to hold himself out as "a consultant in legislative governmental affairs or business consultant generally. I do not intend to practice law in the sense which you are familiar with."

---

2. I note parenthetically that *both* disbarment and suspension (1) become matters of public record and (2) require the attorney so disciplined to notify his clients of that fact and advise them to seek legal advice elsewhere.

3. Both the federal court and the Senate Committee expressed concern at the absence of prosecutions of persons and organizations who received corporate contributions—a violation of law, also.

It seems clear that respondent, while licensed to practice law and practicing law within the meaning of the broadly-worded definition in our rules, has in fact been out of the mainstream of the profession for some time. Accordingly, I think some period of time for reflection and reorientation to the dictates of the profession would be salutary and justified. On balance, considering the nature of the misconduct and the history of respondent, I deem suspension for six months as adequate to insure henceforth respondent's fitness "to be entrusted with professional . . . matters." The longer period of 12 months adopted by the majority in my view carries with it punitive considerations which this court has heretofore rejected as improper. *See District of Columbia Bar v. Kleindienst, supra.*