**In re Elliott ABRAMS, Respondent, A Member of the Bar of the District of Columbia Court of Appeals.**

No. 91–BG–1518.

District of Columbia Court of Appeals.

Argued May 18, 1994.

Decided July 10, 1995.

Charles J. Cooper, with whom William L. McGrath, Washington, DC, was on the brief, for respondent.

Michael S. Frisch, Asst. Bar Counsel, with whom Leonard H. Becker, Bar Counsel, and Julia L. Porter, Asst. Bar Counsel, Washington, DC, were on the brief, for Office of Bar Counsel.

---

Before WAGNER, Chief Judge,* TERRY, Associate Judge, and KERN, Senior Judge.

TERRY, Associate Judge:

█ In this case we must decide whether we have the power to impose disciplinary sanctions against respondent Abrams, a member of the District of Columbia Bar, for making false and misleading statements before three congressional committees, even though he has received a full and unconditional presidential pardon for his actions. After reviewing the pertinent case law, we conclude that such a pardon bars the imposition of sanctions which might otherwise be imposed on attorneys who violate our disciplinary rules. Consequently, we cannot adopt the recommendation of the Board on Professional Responsibility to suspend Mr. Abrams from the practice of law for one year.

I

Elliott Abrams was admitted to the bar of New York in 1974 and to the bar of the District of Columbia in 1979. From July 1985 until the end of 1988, he served as Assistant Secretary of State for Inter-American Affairs under President Reagan. In that capacity he was the government's senior official in matters relating to United States policy in Central America and was a spokesman for the Administration's controversial policy of supporting the resistance movement in Nicaragua.[1]

In early October 1986 an American cargo plane was shot down over Nicaragua. Shortly thereafter Mr. Abrams was called to appear before various congressional committees to respond to public allegations that the government was secretly providing the Contras with arms and other supplies.[2] His first such appearance was before the Senate Committee on Foreign Relations on October 10, 1986. In claiming that the Administration had not participated in the acknowledged efforts of others to supply the Contras with aid since the passage of the Boland Amendment in 1984, Mr. Abrams testified as follows:

> ... In the last two years, since Congress cut off support to the resistance, this supply system has kept them alive. It is not our supply system. It is one that grew up after we were forbidden from supplying the resistance, and *we have been kind of careful not to get closely involved with it and to stay away from it....*
>
> I think that people who are supplying the Contras believe that we generally approve of what they are doing—and they are right. We do generally approve of what they are doing, because they keep the Contras alive while Congress makes its decision, which each House has separately, though obviously final legislation is not yet ready.
>
> So the notion that we are generally in favor of people helping the Contras is correct.
>
> *We do not encourage people to do this.* We don't round up people, we don't write letters, *we don't have conversations, we don't tell them to do this, we don't ask them to do it.* But I think it is quite clear, from the attitude of the administration, the attitude of the administration is that these people are doing a very good thing, and if

---

ment here by such indirection of that which it had not provided for directly.

* Judge Wagner was an Associate Judge of the court at the time of oral argument. Her status changed to Chief Judge on June 14, 1994.

1. From 1981 until October 1984, the United States government lawfully provided the Nicaraguan counter-revolutionaries, or "Contras," with financial support, weapons, military equipment, and tactical assistance in their effort to overthrow the established Sandinista government of Nicaragua. On October 12, 1984, this policy changed when Congress enacted what is commonly referred to as the Boland Amendment, Pub.L. No. 98–473, 98 Stat. 1837, 1935 (1984), which prohibited the United States from providing any further support for the Nicaraguan Contras. The Boland Amendment is section 8066 of the Department of Defense Appropriations Act of 1985, which in turn is section 101(h) of Public Law 98–473.

2. Investigations later revealed that officials of the United States government had been engaged in the unlawful practice of selling arms to the Iranian government and, in turn, diverting the proceeds from those sales to aid the Contra forces in Nicaragua. This matter came to be known as the "Iran–Contra" affair.

they think they are doing something we like, then, in a general sense, they are right. But *that is without any encouragement and coordination from us, other than a public speech by the President, that kind of thing, on the public record.*[3]

Four days later, on October 14, Mr. Abrams testified before the House of Representatives Permanent Select Committee on Intelligence. When he was asked whether he knew if any foreign government, and in particular the government of Saudi Arabia, was supplying the Contras with aid, the following exchange took place:

> MR. ABRAMS: I can only speak on that question for the last fifteen months when I have been in this job, and that story about the Saudis to my knowledge is false. I personally cannot tell you about pre–1985, but in 1985–1986, when I have been around, no.
>
> THE CHAIRMAN: Is it also false with respect to other governments as well?
>
> MR. ABRAMS: *Yes, it is also false.*[4]

Finally, on November 25, 1986, Mr. Abrams was called to testify before the Senate Select Committee on Intelligence. About four hours before his testimony was scheduled to begin, Attorney General Edwin Meese disclosed at a press conference the diversion of funds from the Iran arms sales to the Contras. Later that day Mr. Abrams testified as follows before the Senate Intelligence Committee:

> I was, until today, fairly confident that there was no foreign government contributing to this. But I knew nothing, still don't know anything about the mechanisms by which money was transferred from private groups that have been raising it, to the Contras.[5]

The Iran–Contra affair resulted in the appointment of an Independent Counsel to investigate the actions of several high-ranking officials of the Reagan Administration, including Mr. Abrams. In early October 1991 Mr. Abrams and the Office of Independent Counsel (OIC) reached an agreement whereby Abrams agreed to plead guilty to two misdemeanor charges and to assist in the ongoing investigation. In exchange, the OIC agreed not to prosecute Abrams for any other statements or activities relating to the Iran–Contra matter. Accordingly, on October 7 the OIC filed a two-count information in the United States District Court for the District of Columbia, alleging violations of 2 U.S.C. § 192 (1988).[6]

The first count of the information charged that Abrams had "unlawfully withheld material information" during his testimony on October 10, 1986, before the Senate Committee on Foreign Relations. In support of this charge, the OIC alleged that, before testifying at the Senate hearing, Abrams was aware that Lieutenant Colonel Oliver North, former Deputy Director for Political and Military Affairs of the National Security Council, was working with the Contras and with private benefactors "to keep the resistance alive." In addition, Abrams had allegedly sought the advice of Lieutenant Colonel North on how to arrange a monetary contribution to the Contras from the Sultan of Brunei.

The second count charged Mr. Abrams with having "unlawfully withheld material information" during his testimony on October

---

3. This quotation from Mr. Abrams' testimony, including the italicized passages, is taken from the two-count information filed against him by the Office of Independent Counsel.

4. This quotation, including the italicized sentence, is taken from the second count of the information filed by the Office of Independent Counsel.

5. This quotation is taken from the third count of the specification of charges filed by Bar Counsel before the Board on Professional Responsibility. In that document this entire passage is underlined.

6. 2 U.S.C. § 192 provides:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 or less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

14, 1986, before the House Intelligence Committee. The OIC alleged that in August 1986 Abrams had solicited a $10 million contribution on behalf of the Contras from a representative of the Sultan of Brunei. In the process, he allegedly had provided the Sultan's representative with the number of a Swiss bank account which had been opened by Lieutenant Colonel North to facilitate covert transfers of money to the Contras. On September 16 Abrams had allegedly received information that the Sultan had agreed to contribute the $10 million. The transfer had taken place on September 26, more than two weeks prior to his testimony before the House Committee.

Upon the filing of the information on October 7, 1991, Mr. Abrams pleaded guilty to both counts. A few weeks later he was sentenced to two years' probation and ordered to perform 100 hours of community service. On March 25, 1992, this court referred Mr. Abrams' conviction to the Office of Bar Counsel for appropriate action pursuant to Rule XI, § 10(e), of the court's Rules Governing the Bar. Bar Counsel in due course filed a three-count petition with the Board alleging that Abrams had violated Disciplinary Rule (DR) 1–102(A)(4) during each of his three appearances before congressional committees in October and November 1986.

A hearing was held on December 21, 1992, before a hearing committee of the Board on Professional Responsibility ("the Board"), at which Bar Counsel presented evidence of Abrams' misconduct. Mr. Abrams testified that he was "trying to walk a tightrope" during his congressional testimony:

> I was in government for twelve years, and I tried to serve the country, and I tried to follow the law. I tried very hard to follow the law ... and then I got caught up in a huge political war that I did not create, and I made mistakes....
>
> But I think I did what a responsible official should do ... which is [to] try to balance conflicting responsibilities, to de-

fend the President and his policies, to answer questions honestly, to keep confidences when you [are] instructed to do so, to be accurate, to set the record straight when you [make] mistakes, which you'll inevitably do.

While admitting that he had misrepresented material facts to Congress, Abrams claimed that he had been acting under the instructions of the Secretary of State not to disclose the Brunei solicitation.[7] He also said that he had never functioned as an attorney while at the State Department, and asserted that his status as an attorney was irrelevant to his appearances before Congress. At the close of the hearing, Bar Counsel preliminarily recommended to the hearing committee that Abrams receive a public censure for his ethical misconduct, with the understanding that a formal written recommendation would be made later.

On December 24, 1992, three days after the hearing, President Bush granted Mr. Abrams, along with several other officials, a full and unconditional pardon for any charged or uncharged conduct relating to the Iran–Contra affair. The President gave four reasons for granting these pardons: (1) each individual had acted patriotically, even though his acts might have violated the law; (2) none of the persons involved had been motivated by economic gain; (3) they all had records of long and distinguished service to the United States; and (4) they all had already paid too great a price for the acts they had allegedly committed.

Notwithstanding the pardon, in January 1993 Bar Counsel submitted his formal recommendation to the hearing committee, urging that Mr. Abrams be suspended from the practice of law for at least thirty days, instead of the public censure he had initially proposed. Bar Counsel also contended that the pardon had no effect on the disciplinary proceeding. On April 8 the hearing committee made its report to the Board, finding that

---

7. Later in his testimony, Mr. Abrams said that he did not become aware that important information had been kept from him until the Attorney General's public disclosure of the Iran–Contra affair at his November 25 press conference. "The roof had fallen in on the President and on the Administration," Abrams testified, "and I had no idea what was going on." When the Attorney General made his announcement, Abrams realized that everything he and his staff had been working on for sixteen months "had been crushed by Colonel North and his stupidities."

Abrams' conduct had violated DR 1–102(A)(4). The committee concluded that, because of the seriousness of the violation, a thirty-day suspension was insufficient and recommended instead a suspension of one year.

On July 29, 1993, the Board issued its report and recommendation, in which it urged this court to suspend Mr. Abrams for one year.[8] The Board found that Abrams' conduct was comparable to that in other cases in which attorneys had received one-year suspensions. *See, e.g., In re Kerr,* 611 A.2d 551 (D.C.1992); *In re Shorter,* 570 A.2d 760 (D.C.1990); *In re Hutchinson,* 534 A.2d 919 (D.C.1987) (en banc). Mr. Abrams now challenges the Board's recommendation.

## II

The essence of Mr. Abrams' argument is that a full and unconditional presidential pardon prevents this court from imposing any sanction based on the conduct for which he was pardoned. To support his broad interpretation of the Pardon Clause of the Constitution, he places great reliance on a series of post-Civil War decisions by the Supreme Court. In response, Bar Counsel asserts that these cases have been uniformly criticized by other federal and state courts and may no longer be regarded as reliable precedent. Accordingly, Bar Counsel urges us to hold that a full and unconditional presidential pardon does not affect attorney disciplinary sanctions like the one recommended here.

Before we can decide whether Bar Counsel or Mr. Abrams is correct, we must examine the historical origins and the Supreme Court's subsequent interpretations of the Pardon Clause. To that task we now turn.

### A. The Historical Background of the Pardon Clause

Article II, Section 2, Clause 1 of the Constitution of the United States states in part: "The President ... shall have Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment." Historical accounts of the Constitutional Convention of 1787 reveal that the Founders engaged in very little discussion about the meaning or scope to be given to the President's pardoning authority.[9] Instead, it was believed that the presidential power would be virtually identical to that exercised by the King of England, except that the President's authority to grant pardons would not extend to "cases of impeachment." *Ex parte Grossman,* 267 U.S. 87, 112–113, 45 S.Ct. 332, 334, 69 L.Ed. 527 (1925); *see also Ex parte Wells,* 59 U.S. (18 How.) 307, 311, 15 L.Ed. 421 (1856) ("In the convention which framed the constitution, no effort was made to define or change [the meaning of the word 'pardon'], although it was limited in cases of impeachment").[10] As Chief Justice Marshall explained in an early case:

As this power had been exercised from time immemorial by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance, we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it.

---

8. One member of the Board concluded that a six-month suspension was appropriate because of mitigating circumstances.

9. The greatest debate concerning the Pardon Clause arose when Edmund Randolph of Virginia introduced a measure to prohibit the President from issuing pardons in cases of treason. The measure was rejected, however, when Randolph refused to accept a compromise that would have granted the pardoning power in treason cases to the President and the Senate jointly. Daniel T. Kobil, *The Quality of Mercy Strained: Wresting the Pardoning Power from the King,* 69 Tex.L.Rev. 569, 590–591 & n. 132 (1991).

10. The view that the scope of the President's pardoning power should be modeled after that of the English King was not universally held. In *Ex parte Wells, supra,* Justice McLean argued in dissent that "[t]he executive office in England and that of this country [are] so widely different, that doubts may be entertained whether it would be safe for a republican chief magistrate, who is the creature of the laws, to be influenced by the exercise of any leading power of the British sovereign." 59 U.S. (18 How.) at 318.

*United States v. Wilson*, 32 U.S. (7 Pet.) 150, 160, 8 L.Ed. 640 (1833).[11] Later, in the *Wells* case, in defining the term "pardon" as it was used in England at the time of the Constitutional Convention, the Supreme Court declared: "A pardon is said by Lord Coke to be a work of mercy, whereby the king, either before attainder, sentence, or conviction, or after, forgiveth any crime, offence, punishment, execution, right, title, debt, or duty, temporal or ecclesiastical. . . ." *Ex parte Wells, supra*, 59 U.S. (18 How.) at 311 (citation omitted). But even under the English monarchy, the power to pardon was not absolute. For instance, the King's pardoning authority extended only to matters of "public interest"; it had no impact, for example, on the right of a third party to obtain a private judgment against the recipient of the pardon. *Ex parte Grossman, supra*, 267 U.S. at 111, 45 S.Ct. at 332.[12]

The Supreme Court established from the outset that the Pardon Clause, like its English model, was to be broadly construed. For example, in *United States v. Wilson, supra*, the Court described a pardon as "an act of grace, proceeding from the power entrusted with the execution of the laws, which exempts the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed." 32 U.S. (7 Pet.) at 160.[13] Moreover, in *Ex parte Wells, supra*, the Court held that the President had authority to condition the issuance of a pardon on the recipient's assent to a wide array of terms. 59 U.S. (18 How.) at 314.[14] In so ruling, the Court first demonstrated that conditional pardons were an accepted part of

the English crown's clemency power. *Id.* at 313. Turning then to the actual language of the Constitution, the Court concluded that Article II, Section 2 extended "the power to pardon to all kinds of pardons known in law as such, whatever may be their denomination. We have shown that a conditional pardon is one of them." *Id.* at 314. Thus, from the first judicial interpretations of the Pardon Clause, it was apparent that the President's pardoning authority was expansive and very much aligned with that of the English King.

### B. The Post–Civil War Supreme Court Decisions

During and after the Civil War, Presidents Abraham Lincoln and Andrew Johnson exercised their pardoning authority extensively by granting individual amnesties to supporters of the rebellion.[15] These executive measures were necessary to prevent the bringing of treason charges against former Confederate soldiers and sympathizers. William F. Duker, *The President's Power to Pardon: A Constitutional History*, 18 Wm. & Mary L. Rev. 475, 510–512 (1977). As a result, several cases raising issues of first impression about the scope of the President's pardoning power found their way to the Supreme Court.

The first such case, and the one that most closely resembles the case before us, was *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867). Garland was an attorney from Arkansas who had been admitted to the Supreme Court bar in 1860. During the

---

11. *See also* The Federalist No. 69 (Alexander Hamilton) (president's pardoning power "resembl[es] equally that of the King of Great–Britain and the Governor of New–York") (quoted in *Schick v. Reed*, 419 U.S. 256, 263, 95 S.Ct. 379, 383, 42 L.Ed.2d 430 (1974)).

12. *See also Ex parte Wells, supra*, 59 U.S. (18 How.) at 312–313 (describing common law and statutory limitations on the King's pardoning power); Kobil, *supra* note 9, 69 Tex L.Rev. at 587–588 (same).

13. However, because a pardon, like a deed, is a "private, though official act" which is "not communicated officially to the court," the Court held in *Wilson* that a recipient of a pardon must present it to a court "by plea, motion or other-

wise" in order to enjoy its benefit. 32 U.S. (7 Pet.) at 160–161. Thus, while a pardon bestows on its recipient a far-reaching reprieve from the punitive consequences of his or her wrongdoing, it is not a self-executing instrument.

14. At issue in *Wells* was whether the President could condition the issuance of a pardon to a defendant sentenced to death for murder on his acceptance of a sentence of life imprisonment.

15. The Supreme Court made clear on at least two occasions that the power to grant amnesty is inherent in the President's pardoning power. *See Knote v. United States*, 95 U.S. (5 Otto.) 149, 152–153, 24 L.Ed. 442 (1877); *United States v. Klein*, 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1871).

Civil War, he served in the Congress of the Confederacy. In January 1865 Congress passed legislation, later implemented by a Supreme Court rule, requiring that, as a prerequisite to practicing law in any federal court, all attorneys must take a loyalty oath stating that they had never given aid or comfort to any enemies of the United States. Shortly after this law was enacted, Garland received a full pardon for his actions during the Civil War. Since he could not take the required oath because of his service in the Confederate Congress, he petitioned the Supreme Court for permission to continue practicing as an attorney, arguing *inter alia* that the pardon relieved him of any obligation to take the oath.

Basing its decision in part on a broad reading of the President's pardoning authority,[16] a majority of the Court granted Garland's petition. In defining the scope of the pardon power, the Court declared:

> A pardon reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence. If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity.

*Id.* at 380–381. To this expansive statement the Court added but a single limitation, consistent with similar restrictions on the pardoning authority of the English King. The Court cautioned that a presidential pardon, by itself, "does not restore offices forfeited, or property or interests vested in others in consequence of the conviction and judgment." *Id.* at 381 (footnote omitted).

A few years later, in *Carlisle v. United States*, 83 U.S. (16 Wall.) 147, 21 L.Ed. 426 (1873), the Court once again spoke broadly in interpreting the scope and effect of a full presidential pardon. The plaintiffs in *Carlisle* were British subjects living in Alabama. During the Civil War, Union forces had seized sixty-five bales of cotton, belonging to them, which had been stored on a plantation there. Because the plaintiffs had provided "aid and comfort to the rebellion" by furnishing materials to the Confederacy for use in the manufacture of gunpowder, *id.* at 150, the cotton was sold and its proceeds deposited in the United States Treasury. Thereafter the plaintiffs, who had received a full pardon for their wartime activities, filed suit against the United States under the Captured and Abandoned Property Act in which they sought the proceeds from the sale of the seized cotton. The Court of Claims dismissed their case because of their involvement with the Confederacy, but the Supreme Court reversed. Justice Field, writing for a unanimous Court, elaborated:

> It is true, the pardon and amnesty do not and cannot alter the actual fact that aid and comfort were given by the claimants, but they forever close the eyes of the court to the perception of that fact as an element in its judgment, no rights of third parties having intervened.
>
> There has been some difference of opinion among the members of the court as to cases covered by the pardon of the President, but there has been none as to the effect and operation of a pardon in cases where it applies. *All have agreed that the pardon not merely releases the offender from the punishment prescribed for the offence, but that it obliterates in legal contemplation the offence itself.*

*Id.* at 151 (emphasis added).

█ Following *Garland* and *Carlisle*, the Court in *Knote v. United States, supra* note

---

16. The Court struck down the statute requiring the oath as a bill of attainder and an *ex post facto* law before addressing the pardon issue. *Ex parte Garland, supra*, 71 U.S. (4 Wall.) at 377. As a result, Bar Counsel argues that the Court's pardon discussion is dictum and that *Garland* "is a case of more historical interest than precedential value." We do not agree with this assessment.

We note that the primary basis of the Court's decision is not altogether clear and that the Court's pardon analysis was a significant part of its opinion. In any event, as we shall discuss, many of the Court's subsequent pardon decisions reiterate the language of *Garland* in accepting its broad definition of a full and unconditional pardon.

15, described a presidential pardon as "an act of grace" which "releases the offender from all disabilities imposed by the offence, and restores to him all his civil rights." 95 U.S. (5 Otto.) at 153. Mr. Knote, like the plaintiffs in *Carlisle*, was the owner of property which had been confiscated by the United States because of his assistance to the Confederate cause. The property had been condemned and sold by court order, and the proceeds of the sale had been deposited in the Treasury of the United States. After Knote received a full presidential pardon, he sued for recovery of those proceeds. Justice Field, again writing for the entire Court, stated that such a pardon gives its recipient "a new credit and capacity, and rehabilitates him to that extent in his former position." *Id.* The Court nevertheless rejected his claim, holding that the pardon, by itself, did not entitle him to take money out of the Treasury because it was no longer his money:

> [I]f the proceeds have been paid into the treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress. Moneys once in the treasury can only be withdrawn by an appropriation by law. However large, therefore, may be the power of pardon possessed by the President . . . it cannot touch moneys in the treasury of the United States, except expressly authorized by act of Congress. The Constitution places this restriction on the pardoning power.

*Id.* at 154.[17] Notwithstanding this limitation, *Knote* stands, like its predecessors, for the proposition that a full presidential pardon has the effect of abolishing any legal disabilities flowing from the pardoned conduct. The failure of Knote's claim resulted not from any disability on his part, but from the changed status of the sale proceeds once they were deposited in the Treasury.

The Supreme Court reiterated its broad interpretation of the Pardon Clause in several other cases decided in the period following the Civil War. For instance, in *Osborn v. United States*, 91 U.S. (1 Otto.) 474, 477, 23 L.Ed. 388 (1876), the Court declared, "It is of the very essence of a pardon that it releases the offender from the consequences of his offence." Thus, although a pardon may not interfere with the private rights of third parties ("such rights . . . necessarily remain as they existed previously to the grant of the pardon"), the Court made clear that an unconditional pardon bars the government from penalizing the offender in any way for the conduct underlying the pardon. Hence the Court held that a forfeiture of Osborn's property ordered by a United States District Court, under an 1862 statute authorizing the confiscation of property belonging to persons giving aid and comfort to the rebellion, must be set aside because of his pardon. Since Osborn had fulfilled all the conditions of the pardon, and since his property was still within the control of the federal court in Kansas that ordered the forfeiture [18] (unlike the situation in *Knote* ), the Supreme Court ruled that the property had to be restored to him. "[U]nless rights of others in the property condemned have accrued, the penalty of forfeiture annexed to the commission of the offence must fall with the pardon of the offence itself. . . ." *Id.*[19]

---

17. The claimants in *Carlisle v. United States*, once the effect of their pardon was established, were entitled to file their claim against funds in the Treasury under a specific Act of Congress, the Captured and Abandoned Property Act. *See Carlisle, supra,* 83 U.S. (16 Wall.) at 151–153. The plaintiff in *Knote,* however, did not have a claim under that or any other Act, and thus the Court held he could not recover, despite his pardon.

18. The property had been sold, and the proceeds had been deposited in a bank in Kansas by direction of the court.

19. *See also Brown v. Walker,* 161 U.S. 591, 599, 16 S.Ct. 644, 647, 40 L.Ed. 819 (1896) (the recipient of a pardon "stands with respect to such offence as if it had never been committed"); *Armstrong v. United States,* 80 U.S. (13 Wall.) 154, 155–156, 20 L.Ed. 614 (1871) (a pardon, "granted upon conditions, blots out the offence if proof is made of compliance with the conditions; and . . . the person so pardoned is entitled to the restoration of the proceeds of captured and abandoned property" if suit is timely filed); *United States v. Klein, supra* note 15, 80 U.S. (13 Wall.) at 147 (a pardon "blots out the offence pardoned and removes all its penal consequences"); *United States v. Padelford,* 76 U.S. (9 Wall.) 531, 543, 19 L.Ed. 788 (1869) (by presidential pardon, the

## C. *Later Supreme Court Decisions*

■ The Supreme Court has consistently followed the precedents it established in the post-Civil War cases concerning the scope and effect of a full presidential pardon. For instance, in *Ex parte Grossman, supra*, the Court held that a full presidential pardon extended to criminal contempt of court. In so ruling, the Court rejected the argument that the authority to punish for contempt rested solely with the judiciary and that any effort by the President to undermine that power would violate the principle of separation of powers. 267 U.S. at 98. Rather, the Court noted that there were only two limitations on the President's pardoning authority. First, a pardon could not be granted in cases of impeachment, as specified in the Constitution; second, a pardon could not affect the rights of third parties against the pardoned offender, as established in the common law. *Id.* at 111–112. Thus, even in those areas where the judiciary's authority is said to be dominant, such as criminal contempt, a president may intervene and nullify the sanctions that a court would otherwise have the power to impose.

In *Burdick v. United States*, 236 U.S. 79, 35 S.Ct. 267, 59 L.Ed. 476 (1915), the Court upheld an offender's right to refuse a presidential pardon. The pardon had been issued in an attempt to compel Burdick to testify in a case in which he had previously asserted his Fifth Amendment privilege against self-incrimination. Burdick refused, however, to accept the pardon. The Court held that he could not be forced to accept it, and that if he did not, the pardon would not become effective. In so holding, the Court balanced the President's pardoning power against the offender's Fifth Amendment privilege. "Both have sanction in the Constitution, and it should, therefore, be the anxiety of the law to preserve both—to leave to each its proper place." *Id.* at 93–94. The Court noted that

there was a "confession of guilt implied in the acceptance of a pardon," and that the offender had a right to avoid the "certain infamy" that would result from such a confession. *Id.* at 91. In the end, the Court concluded that the harm inflicted on the President's pardoning power was less than the potential injury that the offender might suffer.[20]

Twelve years later, however, in a similar case in which the offender's privilege against self-incrimination was not at issue, the Court held that the offender could not refuse a presidential pardon commuting his sentence for murder from death to life imprisonment:

> Just as the original punishment would be imposed without regard to the prisoner's consent and in the teeth of his will, whether he liked it or not, the public welfare, not his consent, determines what shall be done. . . . Supposing that Perovich did not accept the change, he could not have got himself hanged against the Executive order.

*Biddle v. Perovich*, 274 U.S. 480, 486–487, 47 S.Ct. 664, 665–666, 71 L.Ed. 1161 (1927). The Court specifically declined to "extend[ ]" the reasoning of *Burdick* to Perovich's case. *Id.* at 488.

In its most recent consideration of the Pardon Clause, the Court once again described the scope of the President's pardoning authority in broad terms. "The plain purpose of the broad power conferred by [the Pardon Clause]," the Court reasoned, "was to allow plenary authority in the President to 'forgive' the convicted person in part or entirely, to reduce a penalty in terms of a specified number of years, or to alter it with conditions which are in themselves constitutionally unobjectionable." *Schick v. Reed, supra* note 11, 419 U.S. at 266. Thus, in ruling that the President could reduce a death sentence to life imprisonment without

---

offender "was purged of whatever offence against the laws of the United States he had committed by the acts mentioned in the findings, and relieved from any penalty which he might have incurred").

**20.** As we shall discuss in part IV of this opinion, *Burdick* is frequently cited as the Supreme Court's supposed retraction of the broad lan-

guage employed in the *Garland* line of cases. But *Burdick* had nothing to do with the pardon's effect on the substantive consequences of a criminal conviction, nor did it even discuss *Garland* or any of the other Reconstruction era cases. Thus we cannot read *Burdick* as a retreat by the Supreme Court from the principles established in *Garland* and its progeny.

the possibility of parole, the Court concluded that "the pardoning power is an enumerated power of the Constitution and that its limitations, if any, must be found in the Constitution itself." *Id.* at 267.

■ We have undertaken this survey of Supreme Court cases in order to highlight two significant features of a full and unconditional presidential pardon. First, the Court has made clear that such a pardon attaches not just to a criminal conviction, but also to the conduct which is or may be the basis of a conviction. Not only does the Pardon Clause itself speak in terms of "offences" rather than convictions,[21] but the Court's decisions have often characterized a pardon as obliterating, in the eyes of the law, the offense committed by the pardon's recipient. *See, e.g., Knote, supra,* 95 U.S. (5 Otto.) at 153 ("A pardon is an act of grace by which an offender is released from the consequences of his offence"); *Carlisle, supra,* 83 U.S. (16 Wall.) at 151 (although a pardon does not alter the fact that an offense was committed, it nevertheless "close[s] the eyes of the court to the perception of that fact").

Second, because the pardon attaches to the underlying conduct, the Court has established that a pardoned offender enjoys immunity not only from criminal prosecution, but also from any other form of punishment or civil disability imposed as a consequence of his actions. Many of the early Supreme Court cases involved attempts by the government to impose non-penal sanctions or disabilities on the pardoned offender, all of which the Court struck down. For example, in *Ex parte Garland,* the Court's decision to set aside an attorney's exclusion from practice in the federal courts was predicated on a holding that the pardon restored to him all of the rights and privileges he had enjoyed before his involvement in the Civil War. 71 U.S. (4 Wall.) at 380; *see also Boyd v. United States,* 142 U.S. 450, 453–454, 12 S.Ct. 292, 293–294, 35 L.Ed. 1077 (1892) (full and unconditional pardon restores testimonial competency of convicted felon); *Knote v. United States, supra* note 15, 95 U.S. at 153 (a

pardon releases the offender "from all disabilities imposed by the offence").

With these principles in mind, we turn to the specific issue presented in this case.

## III

Whether the presidential pardon of Mr. Abrams prohibits us from imposing disciplinary sanctions against him depends on our resolution of a slightly more refined issue: whether the proposed sanctions would constitute either a form of punishment or a civil disability stemming from his involvement in the pardoned offenses. The Supreme Court has made clear that Mr. Abrams' pardon would prevent us from suspending him if we conclude that a disciplinary sanction is either a punishment or a civil disability.

### A. *Disciplinary Sanction As Punishment*

■ Addressing first the punishment issue, we start with the proposition that disciplinary proceedings against a member of the bar, although intended to protect the public and to preserve the integrity of the legal profession, nevertheless have the additional effect of punishing the sanctioned attorney. *In re Ruffalo,* 390 U.S. 544, 550, 88 S.Ct. 1222, 1225, 20 L.Ed.2d 117 (1968). Thus the Supreme Court has held that disciplinary matters are "adversary proceedings of a quasi-criminal nature." *Id.* at 551 (citation omitted). Indeed, the Court in *Ex parte Garland* declared that "exclusion from any of the professions or any of the ordinary avocations of life for past conduct can be regarded in no other light than as punishment for such conduct." 71 U.S. (4 Wall.) at 377.

Of course, this court on many occasions has emphasized that the purpose of bar discipline is "to serve the public and professional interests ... rather than to visit punishment upon an attorney." *In re Reback,* 513 A.2d 226, 231 (D.C.1986) (en banc) (citations omitted); *see also In re Williams,* 513 A.2d 793, 796 (D.C.1986). Nevertheless, we have acknowledged that an unintended, yet inevitable, result of imposing a sanction on an

---

**21.** "[T]he term 'offences' is used in the Constitution in a more comprehensive sense than are the terms 'crimes' and 'criminal prosecutions.'" *Ex*

*parte Grossman, supra,* 267 U.S. at 117 (citation omitted).

attorney is that the attorney is penalized to some degree. *See, e.g., In re Wild,* 361 A.2d 182, 184 (D.C.1976). Accordingly, because of the harsh consequences that often result from disciplinary proceedings, we have held that attorneys are entitled to due process safeguards. *In re Thorup,* 432 A.2d 1221, 1225 (D.C.1981); *In re Wild, supra,* 361 A.2d at 184; *cf. In re Williams, supra,* 513 A.2d at 797 ("delay coupled with actual prejudice could result in a due process violation"). Given these authorities, we conclude that the sanction recommended in this case—a one-year suspension from the practice of law—would have a punitive impact on Mr. Abrams.

The Supreme Court's expansive reading of the Pardon Clause compels this conclusion. *See, e.g., Knote v. United States, supra* note 15, 95 U.S. (5 Otto.) at 153 ("A pardon is an act of grace by which an offender is released from the consequences of his offence"); *United States v. Klein, supra* note 15, 80 U.S. (13 Wall.) at 147 (a pardon "blots out the offence pardoned and removes all its penal consequences"). Indeed, when faced with an analogous set of facts in *Ex parte Garland,* the Court expressly held that a full presidential pardon nullified an attorney's exclusion from practice and restored him to the identical position he occupied before committing the offense:

> [W]hen the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence. If granted ... after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man....

71 U.S. (4 Wall.) at 380–381. Likewise, *Ex parte Grossman* teaches that a full presidential pardon shields its recipient even from sanctions which are left to the sole discretion of the judiciary to impose. *Grossman, supra,* 267 U.S. at 119–120, 45 S.Ct. at 336–337. Reading *Garland* and *Grossman* together, we conclude that we cannot impose any punitive sanction on Mr. Abrams based on the

conduct which was the subject of his presidential pardon.

## B. *Disciplinary Sanction As a Collateral Consequence of the Pardoned Offense*

■ There is a separate and independent ground for rejecting the Board's recommendation. As we have seen, a full presidential pardon insulates its recipient not only from punitive sanctions based on the pardoned offense, but also from any civil disabilities or collateral consequences flowing from the offense. Since the proposed suspension of Mr. Abrams cannot be viewed except as a collateral consequence of the pardoned offense, we once again conclude that we are without authority to impose such a sanction.

■ In reaching this conclusion, we are guided in particular by the Supreme Court's analysis in *Boyd v. United States, supra.* In that case a government witness in a murder trial named Martin Byrd had previously been convicted of larceny and thus had forfeited his capacity to testify. In an effort to restore his testimonial capacity, the United States Attorney asked President Benjamin Harrison to pardon Byrd, who had already served his sentence for larceny. President Harrison agreed and granted Byrd a full and unconditional pardon. In rejecting the petitioners' argument that the pardon had no bearing on Byrd's capacity to testify, the Court said:

> This pardon removed all objection to the competency of Martin Byrd as a witness. The recital in it that the district attorney requested the pardon in order to restore Byrd's competency as a witness in a murder trial ... did not alter the fact that the pardon was, by its terms, "full and unconditional." The disability to testify being a consequence, according to the principles of the common law, of the judgment of conviction, the pardon obliterated that effect. The competency as a witness of the person so pardoned was, therefore, completely restored.

142 U.S. at 453–454, 12 S.Ct. at 293–294 (citations omitted).[22] Although the testimo-

---

**22.** Ironically, the attorney for the petitioners in *Boyd* (the losing parties) was A.H. Garland, whose case twenty-five years earlier had established the basic principles on which *Boyd* and many other cases were decided.

nial incapacity of convicted felons has been generally abolished,[23] the reasoning of *Boyd* is still applicable to the case at bar. At common law, the rationale behind witness disqualification was that convicted felons were inherently untrustworthy and thus could not be relied upon to give accurate or truthful testimony. Walter M. Grant, *et al.*, Special Project, *The Collateral Consequences of a Criminal Conviction*, 23 VAND.L.REV. 929, 1037–1038 (1970). Despite this perception, the Court in *Boyd* held that a pardon restored a felon's testimonial capacity—even though in reality the offender was no more trustworthy after receiving the pardon than before. Likewise, in this case, we do not view Mr. Abrams' pardon as vindicating his ill-advised decision to deceive Congress. We hold only that his full and unconditional pardon protects him from any kind of official disciplinary or punitive response.

We find additional support for our conclusion in *Ex parte Garland,* in which the Court flatly rejected the notion that Congress had authority to place any restrictions on the effect of a presidential pardon.[24] The congressional restriction in *Garland* was a law requiring all attorneys wishing to practice in the federal courts to take a loyalty oath— regardless of whether a particular attorney had been pardoned for aiding the Confederacy. The Court held that such a restriction interfered with the virtually "unlimited" power of the President to grant pardons. 71 U.S. (4 Wall.) at 380. In so holding, the majority necessarily rejected Justice Miller's dissenting argument that Garland's pardon relieved him "from all punishment which the law inflicted for his offence," but from "nothing more." *Id.* at 396.[25] Instead, the majority held precisely the opposite: that a pardoned offender is immune from *any* type of punitive or disciplinary measure based on the offense for which the pardon was granted.

Moreover, and of special significance here, *Garland* illustrates that restrictions on an attorney's ability to practice law are among the collateral consequences which a full presidential pardon prohibits.

Finally, Mr. Abrams places considerable reliance on *Bjerkan v. United States,* 529 F.2d 125 (7th Cir.1975), for the proposition that the suspension of his right to practice law would be a civil disability resulting from his conviction. In *Bjerkan* an attorney had been convicted of refusing to report for induction into the military. While he was incarcerated and his habeas corpus appeal was pending, he received a full and unconditional pardon from the President. The issue before the court was whether the pardon eliminated all collateral consequences of conviction and thus mooted the appeal.

In holding that the pardon had indeed mooted the appeal, the Seventh Circuit interpreted an earlier Supreme Court decision, *Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), which discussed the collateral consequences of a criminal conviction:

> The "collateral consequences" noted in *Carafas* were of a substantial nature, consisting of a deprivation of a person's basic rights, *the right to work in certain professions*, the right to vote, and the right to serve on a jury. Clearly, then, although the pardon will not render the petitioner innocent, if it restores all his basic civil rights, both state and federal, it will do away with the "collateral consequences" of his conviction.

*Bjerkan, supra,* 529 F.2d at 126–127 (emphasis added). Indeed, the Supreme Court in *Carafas,* a case not involving a pardon, specifically noted that occupational disabilities resulting from a criminal conviction were

---

**23.** *See, e.g.,* D.C.Code § 14–305(a) (1995); *see also* FED.R.EVID. 601.

**24.** "This power of the President is not subject to legislative control. Congress can neither limit the effect of his pardon, nor exclude from its exercise any class of offenders. The benign prerogative of mercy reposed in him cannot be fettered by any legislative restrictions." *Garland, supra,* 71 U.S. (4 Wall.) at 380.

**25.** Justice Miller, concluding that "the oath required as a condition to practising law is not a punishment," maintained that "the pardon of the President has no effect in releasing [Garland] from the requirement to take it. If it is a qualification which Congress had a right to prescribe as necessary to an attorney, then the President cannot, by pardon or otherwise, dispense with the law requiring such qualification." *Ex parte Garland, supra,* 71 U.S. (4 Wall.) at 396–397 (dissenting opinion).

"collateral consequences" of that conviction and thus did not moot a habeas corpus proceeding even though the petitioner's prison term had expired. 391 U.S. at 237, 88 S.Ct. at 1559. Following this precedent, the court in *Bjerkan* concluded:

> [A]ny deprivation of a person's basic civil rights, including the right to vote, the right to serve on juries, and the right to work in certain professions ... on account of a federal conviction would constitute a punishment. If the conviction were pardoned, as it was here, such attempted punishment would constitute a restriction on the legitimate, constitutional power of the President to pardon an offense against the United States and would be void as circumscribing and nullifying that power.

529 F.2d at 128 (citation and footnote omitted).

The court in *Bjerkan* also emphasized that, although a pardon "cannot erase the basic fact of conviction [or] wipe away the social stigma" that attaches to it, courts are powerless to impose any form of disciplinary sanction against a pardoned offender. *Id.* at 126–127.[26] In so ruling, the court cited *Knote v. United States, supra* note 15, and *Armstrong v. United States, supra* note 19, cases decided by the Supreme Court in the aftermath of *Ex parte Garland.* In light of our own review of the *Garland* line of cases, we agree with the *Bjerkan* court's assessment of the sweeping effect of a full presidential pardon on the collateral consequences of a criminal conviction. Since the proposed suspension of Mr. Abrams would be such a consequence, we cannot impose it.

**26.** The *Bjerkan* court further held, in reliance on *Carlesi v. New York,* 233 U.S. 51, 34 S.Ct. 576, 58 L.Ed. 843 (1914), that a presidential pardon also restores a pardoned offender's civil rights under state law as well as federal law. 529 F.2d at 127–128. No state-federal issue is presented in the instant case, since this court, "the highest court of the District of Columbia," D.C.Code § 11–102 (1995), was established by Congress under Article I of the Constitution and is thus a creature of federal law. *See Lee v. District of Columbia Board of Appeals & Review,* 423 A.2d 210, 216 n. 13 (D.C.1980).

**27.** An early federal decision anticipated Williston's position. In *In re Spenser,* 22 F.Cas. 921

## IV

Finally, we address Bar Counsel's suggestion that the Supreme Court's post-Civil War pardon cases are of dubious precedential value because they have been widely criticized and rejected by other federal and state courts. Much of the modern criticism surrounding the *Garland* line of cases had its origin in a 1915 article by Samuel Williston in the Harvard Law Review. According to Professor Williston, the common perception is that pardoned offenders are in fact guilty, and that "when it is said that in the eye of the law they are as innocent as if they had never committed an offence, the natural rejoinder is, then the eyesight of the law is very bad." Samuel Williston, *Does a Pardon Blot Out Guilt?,* 28 HARV.L.REV. 647, 648 (1915). Williston maintained that the scope of a pardon should be viewed more narrowly than the Supreme Court had viewed it:

> The pardon removes all legal punishment for the offence. Therefore if the mere conviction involves certain disqualifications which would not follow from the commission of the crime without conviction, the pardon removes such disqualifications. On the other hand, if character is a necessary qualification and the commission of the crime would disqualify even though there had been no criminal prosecution for the crime, the fact that the criminal has been convicted and pardoned does not make him any more eligible.

*Id.* at 653.[27]

Yet, despite his disapproval of the Supreme Court's earlier decisions, Williston ac-

(C.C.D.Ore.1878) (No. 13,234), the court held that a full gubernatorial pardon—which the court viewed as having the same scope as a presidential pardon—did not restore the good character of a person convicted of perjury who was applying for United States citizenship. In declining to read *Ex parte Garland* as insulating the offender from any form of punishment or civil disability resulting from the conviction, the court reasoned that a pardon "does not operate retrospectively. The offender is purged of his guilt, and thenceforth he is an innocent man; but the past is not obliterated nor the fact that he had committed the crime wiped out." *Id.* at 923. Thus the court concluded that the pardoned offender had not behaved "as a man of good moral character" because "the fact remains, notwith-

knowledged that in cases involving the disbarment of pardoned attorneys, "courts have found some difficulty in escaping the language of *Ex parte Garland.*" *Id.* at 655. Williston noted that courts in Kentucky,[28] Maine, and New York had all managed to disbar pardoned attorneys since the *Garland* decision, but he found none of those decisions to be particularly illuminating. *Id.* at 656. With respect to one of those cases, Williston observed:

> The New York court, though disbarring the offender, was itself guilty of the following unpardonable reasoning:
>
>> "The pardon does reach the offence for which he was convicted, and it does blot it out, so that he may not now be looked upon as guilty of it. But it cannot wipe out the act that he did, which was adjudged an offence. It was done, and will remain a fact for all time."
>
> How a man who "may not now be looked upon as guilty" of a crime, nevertheless did the act which was a crime and must now be disbarred for it, it is difficult to imagine.

*Id.* (quoting *In re Attorney*, 86 N.Y. 563, 569, 52 N.Y.S. 173, (1881)). We agree with Williston's analysis of this decision. Although *Garland* and its progeny were decided during a unique period in our country's history, a time in which reconciliation was a primary political objective, that fact does not—and cannot—diminish the controlling precedential value that these cases collectively have established.

Nevertheless, Bar Counsel points to several federal decisions which explicitly characterize the holding in *Garland* as dictum and, in turn, embrace Williston's crabbed view of the effect of a presidential pardon. Ironically, the first such case—and the one that has spawned additional criticism of *Garland*—is *Bjerkan v. United States, supra.* Despite the *Bjerkan* court's recognition that a full presidential pardon shielded its recipient from any substantive sanction based on the underlying conviction, the court said in a footnote that "[a] pardon does not 'blot out guilt' nor does it restore the offender to a state of innocence in the eye of the law as was suggested in *Ex parte Garland....*" 529 F.2d at 128 n. 2. For this proposition the court cited *Burdick v. United States, supra,* 236 U.S. at 91, 35 S.Ct. at 269, which, as we have observed, did not overrule—or even explicitly mention—the *Garland* line of cases.[29] The court in *Bjerkan* then cited Williston's article to support its view that "the fact of *conviction* after a pardon cannot be taken into account in subsequent proceedings. However, the fact of the *commission of the crime* may be considered." 529 F.2d at 128 n. 2 (emphasis added).

Two years later, in *Grossgold v. Supreme Court of Illinois,* 557 F.2d 122, 125 (7th Cir.1977), a case involving the three-year suspension of a pardoned attorney, the court followed the reasoning of the *Bjerkan* footnote and declared that the attorney's pardon did not relieve him from the disciplinary sanction. "Applying *Bjerkan* here," the court said, "we hold that a presidential pardon does not relieve an attorney from discipline.... Even if plaintiff had been acquitted of the criminal charge, an Illinois disciplinary proceeding based upon his allegedly criminal conduct would not be precluded." *Id.* at 126 (citations omitted). Thus, by endorsing the Willistonian position, the court in *Grossgold* drew a distinction between crimi-

---

standing the pardon, that the applicant was guilty of the crime of perjury...." *Id.*

**28.** The Kentucky case cited in Williston's article, *Nelson v. Commonwealth*, 128 Ky. 779, 109 S.W. 337 (1908), is quoted at length in Bar Counsel's brief for the proposition that a pardon does not interfere with a court's plenary authority to institute disciplinary sanctions against attorneys. However, the *Nelson* case, like in *In re Spenser, supra* note 27, and *In re Lavine*, 2 Cal.2d 324, 41 P.2d 161 (1935), involved an offender who had received a *gubernatorial* pardon under state law. The case at bar concerns only the *presidential* pardoning authority granted to the executive un-

der the United States Constitution, as adapted from the common law. *See Biddle v. Perovich, supra,* 274 U.S. at 480, 486 (a presidential pardon "is not a private act of grace from an individual happening to possess power" but rather "is a part of the Constitutional scheme"). Decisions analyzing the scope of a governor's pardoning authority have no bearing at all on the soundness of the *Garland* line of cases, which focus instead on what is at issue in this case: the pardoning authority of the President of the United States.

**29.** See note 20, *supra.*

nal *conduct* and a criminal *conviction* and reasoned that a presidential pardon insulates the recipient from the collateral consequences of only the latter. Accordingly, the court reasoned, since a court may impose disciplinary sanctions against an attorney even in the absence of a criminal conviction, a pardon has no effect at all on such proceedings.

Most recently, the Third Circuit has ruled that a full and unconditional presidential pardon does not entitle its recipient to have a criminal conviction expunged from his record. *United States v. Noonan,* 906 F.2d 952 (3d Cir.1990). In reaching this conclusion, the court cited *Burdick v. United States, supra,* as indicating the Supreme Court's retreat from the position it took in *Garland* that a pardon blots out the existence of guilt. *Id.* at 958. The court also quoted favorably from the *Bjerkan* footnote and from various English cases expressing a considerably narrower view of the pardoning power than that expressed in *Garland* and its progeny. *Id.* at 959–960.

If we were writing on a clean slate, we might (or might not) be inclined to follow the reasoning of the Third and Seventh Circuits. Those decisions, however, are plainly irreconcilable with the Supreme Court's consistent and explicit pronouncements on the scope of a presidential pardon. Even assuming that the Court's pardon discussion in the *Garland* case itself is dictum, the Court has reiterated its expansive reading of the Pardon Clause in many subsequent decisions by which we are bound.[30] *See, e.g., Ex parte Grossman, supra,* 267 U.S. at 117, 45 S.Ct. at 336; *Knote v. United States, supra* note 15, 95 U.S. (5 Otto.) at 153; *Carlisle v. United States, supra,* 83 U.S. (16 Wall.) at 151. We cannot ignore or avoid the collective force of these decisions.

 In short, Bar Counsel's arguments are based on the faulty premise that lower federal court decisions decided in the latter half of this century somehow outweigh a series of Supreme Court decisions issued in an earlier period. We know of no authority supporting the view that, simply because an opinion issued by the Supreme Court is old, it may no longer be viewed as binding precedent; on the contrary, it is binding until the Supreme Court says otherwise, or (in some cases) until Congress changes the applicable law.

V

Nothing we have said in this opinion should be construed as condoning Mr. Abrams' admitted violations of federal law. "A lawyer is held to a high standard of honesty, no matter what role the lawyer is filling: acting as lawyer, *testifying as a witness in a proceeding,* handling fiduciary responsibilities, or conducting the private affairs of everyday life." *In re Jackson,* 650 A.2d 675, 677 (D.C.1994) (emphasis added). Lying to Congress is reprehensible under any circumstances, and, but for the pardon, Abrams' conviction based on that conduct might well lead us to impose a sanction as recommended by the Board. However, the "act of grace" which President Bush has seen fit to bestow upon him has left us powerless to act. We therefore have no choice but to reject the Board's recommendation and impose no sanction whatsoever.

*It is so ordered.*

---

30. There can be no doubt that the Supreme Court "is the ultimate authority in interpreting ... any ... part of the Constitution." *Allison v. United States,* 623 A.2d 590, 592 (D.C.1993).